**Debra J. DIAMOND**

v.

**T. ROWE PRICE ASSOCIATES, INC.**

No. L–92–1071.

United States District Court,
D. Maryland.

April 28, 1994.

374

Marcy M. Hallock and Elizabeth G. Jacobs, Baltimore, MD, for plaintiff.

Robert B. Barnhouse, Richard J. Hafets and Emmett F. McGee, Jr., of Baltimore, MD, for defendant.

## MEMORANDUM

LEGG, District Judge.

## I. *INTRODUCTION*

Pending before the Court are cross-motions for summary judgment filed by both parties to this employment discrimination case. Plaintiff, Debra J. Diamond, is a portfolio manager and financial analyst who worked for defendant, T. Rowe Price Associates, Inc. ("T. Rowe Price"), from 1977 until 1992. Headquartered in Baltimore, T. Rowe Price is an investment management firm that is known nationally for its large, publicly held

mutual funds. Alleging gender and religious discrimination,[1] Diamond sued her former employer under the Equal Pay Act of 1963 and Title VII of the Civil Rights Act of 1964.[2]

This Court's earlier rulings narrowed Diamond's complaint, as amended, to three claims. They are:

(1) that she received unequal pay for the three years ending April 16, 1992, the day her suit was filed;

(2) that she was constructively discharged on March 24, 1992, her last day of work; and

(3) that T. Rowe Price, animated by discrimination, failed to promote her to the position of Managing Director.

T. Rowe Price responded to the suit by denying the charges and by filing a counterclaim. Divided into six counts, the counterclaim, as amended, generally alleges that Diamond misappropriated T. Rowe Price's confidential documents and trade secrets when she left work and that she has refused to repay loans and advances.

Following extensive discovery, both sides filed motions for summary judgment. T. Rowe Price moved for summary judgment on all claims in Diamond's amended complaint and also on Count VI[3] of its amended counterclaim. Diamond opposed the motions and also moved for summary judgment on all counts of the amended counterclaim.

The issues were thoroughly briefed; the memoranda and supporting exhibits on file run over 1000 pages. On November 24 and 29, 1993, the Court heard oral argument on the motions relating to Diamond's amended complaint. Under D.Md.R. 105.6, the Court shall dispense with argument on the motions relating to the counterclaim.

Because of the large number of issues involved and the length of this Memorandum, the Court will briefly summarize its reasoning and conclusions. First, as to the compensation discrimination claim, Diamond must establish that she was paid less than male fund managers because of her gender or her religion. This she cannot do. During the relevant time, Diamond's pay at T. Rowe Price was directly tied to the objective success of the two funds she managed. As detailed in two successive employment contracts, one for each fund, Diamond's compensation was composed of a fixed base salary and incentive bonuses tied both to the funds' absolute growth and to their performance relative to a stock market index. The contracts, which were negotiated at arm's length through counsel,[4] specify that T. Rowe Price had no obligation to award Diamond annual bonuses, stock options, or other sums not provided for in the agreements.

Thus, under these contracts, Diamond's compensation fluctuated with the success of her funds. The first fund, New Frontier Fund I, was highly profitable. Upon its liquidation in 1989, Diamond received her annual salary of $100,000 plus almost $1 million in bonuses. Annualized over the fund's life (1985–1989), Diamond's compensation averaged approximately $325,000 per year.[5] The second fund, New Frontier Fund II ("NFFII"), lost money, however. From 1990–1992, Diamond's annualized compensation amounted to little more than her base salary of $130,000.

As a matter of law, an employee's compensation discrimination claim fails if the employee is paid according to a system that pegs earnings to quality or quantity of pro-

1. Diamond is a Jewish female.

2. Equal Pay Act of 1963, as amended, 29 U.S.C. § 206(d), and Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e to 2000e–17.
 The Supreme Court recently held that the Civil Rights Act of 1991 ("CRA") does not apply retroactively to a Title VII suit pending when the CRA was enacted on November 21, 1991. *Landgraf v. USI Film Products,* —— U.S. ——, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994). The decision has no effect on this suit.

3. Failure to Pay Debt.

4. The first contract was negotiated through counsel in 1985. The second contract, signed in 1989, is essentially a reiteration of the 1985 contract. Diamond did not retain counsel for the 1989 contract modifications and negotiated directly with T. Rowe Price.

5. This figure does not include annual bonuses of $20,000, $20,000, and $25,000 that she received in 1987, 1988, and 1989, respectively.

duction or any factor other than sex.[6] The Court concludes that Diamond's employment contracts established such a system. Accordingly, the Court shall grant T. Rowe Price's Motion for Summary Judgment as to Diamond's compensation discrimination claim.

Second, Diamond, who left work on March 24, 1992, contends that T. Rowe Price constructively discharged her by eroding her management authority as to the second fund and by encouraging the fund's investors to withdraw their money. Through these actions, Diamond claims, T. Rowe Price forced her to resign.

The Fourth Circuit has cautioned that constructive discharge claims must be "carefully cabined" because they are "open to abuse by those who leave employment of their own accord."[7] An employee must show that his or her employer deliberately made working conditions so intolerable that any reasonable person would have resigned.[8] Diamond cannot make such a showing.

Diamond admits that no one at T. Rowe Price was hostile, personally abusive, or discourteous to her. Indeed, the persons she accuses of discrimination are the very same persons who worked with her amicably for over a decade. Diamond also concedes that two top-echelon managers at T. Rowe Price indicated that she had a place at the firm despite the poor performance of the second fund. While her long term future at T. Rowe Price was unclear, Diamond left before she and the firm had an opportunity to explore a mutually satisfactory job assignment after the liquidation of NFFII. Given Diamond's high base salary and the non-hostile work environment at T. Rowe Price, the Court concludes that no reasonable person would have felt compelled to resign when Diamond did. Accordingly, the Court shall grant T. Rowe Price's Motion for Summary Judgment on Diamond's constructive discharge claim.

Finally, Diamond's claim for failure to be designated a Managing Director also fails. The term "Managing Director" is largely an honorary title given to a relative handful of T. Rowe Price's senior management employees in recognition of their exceptional responsibility within the firm. Generally speaking, Managing Directors either run entire departments or manage funds valued in the hundreds of millions or even billions of dollars. Diamond, in comparison, managed two successive limited partnerships, each valued at approximately $20 million, and supervised two employees. Diamond's responsibility within the firm, while substantial, simply did not approach the managing director level. Additionally, T. Rowe Price demonstrated that a male portfolio manager with a more successful investment record and more responsibility than Diamond has also not been named Managing Director.

The Court concludes, therefore, that no reasonable jury could find that Diamond had the objective qualifications to merit the title of Managing Director. Accordingly, the Court shall grant T. Rowe Price's Motion for Summary Judgment on Diamond's promotion claim.

The Court also disposes of all six counts of T. Rowe Price's amended counterclaim. The first five counts involve Diamond's alleged refusal to return a large number of T. Rowe Price files that Diamond maintained in her

6. *Hassman v. Valley Motors, Inc.*, 790 F.Supp. 564, 567 (D.Md.1992); *Keziah v. W.M. Brown & Son, Inc.*, 888 F.2d 322, 324 (4th Cir.1989).

7. *Paroline v. Unisys Corp.*, 879 F.2d 100, 114 (4th Cir.1989) (Wilkinson, J., concurring in part and dissenting in part), *adopted en banc*, 900 F.2d 27, 28 (4th Cir.1990).

8. *Bristow v. Daily Press, Inc.*, 770 F.2d 1251, 1255 (4th Cir.1985), *cert. denied*, 475 U.S. 1082, 106 S.Ct. 1461, 89 L.Ed.2d 718 (1986). In creating the EEOC and enacting the several statutes regulating the workplace, Congress has expressed a clear preference that employees who file charges with the EEOC remain on the job while their claims are being investigated. *See Patterson v. McLean Credit Union*, 491 U.S. 164, 180–81, 109 S.Ct. 2363, 2374–75, 105 L.Ed.2d 132 (1989); *Jurgens v. EEOC*, 903 F.2d 386, 390 (5th Cir.1990) (citing *Bourque v. Powell Elec. Mfg. Co.*, 617 F.2d 61, 65–66 (5th Cir.1980)); *Halbrook v. Reichhold Chemicals, Inc.*, 735 F.Supp. 121, 127 (S.D.N.Y.1990) (asserting that "the standard remedy under [Title VII] is for an employee to stay and fight"). Because federal law protects an employee from an employer's retaliatory tactics, there is no reason, short of intolerable work conditions, for an employee to walk off the job after filing an EEOC charge.

office at home or took with her when she left the firm. T. Rowe Price's claims fail. Diamond has now returned the files. T. Rowe Price has proffered no evidence that Diamond misused them or that the firm suffered any damage from their temporary absence. Thus, the Court shall grant Diamond's Motion for Summary Judgment as to Counts I–V of the amended counterclaim.

Count VI involves Diamond's alleged failure to repay T. Rowe Price loans and advances associated with the two funds she managed. The sums involved total $110,085. Of this figure, $35,000 represents a demand note that is now due and payable, and the Court shall grant T. Rowe Price's Motion for Summary Judgment in that amount.

The remaining $75,085 represents cash distributions that the NFFII partnership allegedly dispersed to Diamond in error. This Court lacks subject matter jurisdiction over this controversy, however. The documents governing NFFII provide that any disputes over the second fund will be resolved in the courts, and according to the laws, of the Netherlands Antilles. Thus, the Court shall dismiss the $75,085 claim for lack of subject matter jurisdiction.

In sum, after careful consideration of these issues, the Court shall, by separate order,

(1) GRANT T. Rowe Price's motion for summary judgment on all counts of the second amended complaint;

(2) GRANT Diamond's motion for summary judgment on Counts I–V of the amended counterclaim;

(3) GRANT T. Rowe Price's motion for summary judgment on Count VI of the amended counterclaim as it relates to a $35,000 loan to Diamond that she has not repaid; and

(4) DISMISS, because of lack of subject matter jurisdiction, that part of Count VI of the amended counterclaim relating to $75,085 that T. Rowe Price allegedly overpaid Diamond.

---

9. The NFFI prospectus refers to the partnership as "Winchester Frontier Limited," an investment vehicle created under the auspices of Drexel Burnham Lambert and managed by T. Rowe Price. Both parties, however, refer to the Winchester partnership as New Frontier Fund I, and the Court shall do the same.

## II. FACTS

In 1977, T. Rowe Price hired Debra J. Diamond as a research analyst. After a three-month probationary period, she was assigned to the New Horizons Fund ("New Horizons"), a mutual fund invested primarily in the common stock of small, rapidly growing companies. Specializing in health care and service companies, Diamond compiled a solid record and advanced within the company. Within several years, she had become a member of the Advisory and Investment Committees of New Horizons as well as a Vice President of T. Rowe Price.

By the mid 1980s, Diamond wished to be placed in charge of a fund. She alleges that she was passed over for such responsibility in favor of males with lesser performance records. Her solution, Diamond contends, was to create a fund of her own.

In 1985, through the efforts of Diamond, T. Rowe Price, and Drexel Burnham Lambert, New Frontier Fund I ("NFFI") was created.[9] An investment limited partnership, NFFI was capitalized by contributions totalling approximately $20 million from the limited partners, all of whom were European, and $500 thousand from T. Rowe Price, the general partner.

As general partner, T. Rowe Price bore ultimate responsibility for the fund's performance and designated a senior executive, Edward J. Mathias, to serve as the fund's director. Although Mathias was Diamond's nominal supervisor, Diamond, as the fund's president, actively managed all aspects of NFFI's affairs, including marketing, raising capital, selecting stocks, and communicating with investors.

According to the fund's prospectus, NFFI would concentrate on the common stock of small (capitalization under $35 million) publicly traded "growth" companies. After approximately five years, the partnership would be terminated and the corpus of the fund distributed.

At this time, Diamond not only wanted a fund to manage, but she also considered her compensation to be discriminatorily low.[10] Under the standard compensation system at T. Rowe Price, a professional level employee such as Diamond could expect to receive a base salary plus an annual bonus and stock options as determined by the Compensation Committee. Although Diamond regularly received annual bonuses and stock options before 1985,[11] she was dissatisfied with her overall compensation, which, she believed, reflected neither her performance nor her responsibilities at the firm.

During the inception of NFFI, Diamond hired an attorney[12] to negotiate a contract that would remove her from the standard compensation system. Diamond's objective was to link her remuneration to NFFI's performance. In a memorandum dated March 29, 1985 to T. Rowe Price's management, Diamond proposed "reducing or freezing [her then $95,000] salary at current levels."[13] In addition, Diamond stated that she "would expect little or no bonuses on an annual basis for the life of the New Frontier Fund."[14]

Some members of T. Rowe Price's Management Committee resisted making an exception to the standard pay system. Diamond was requesting a compensation scheme that was, and is, unique within T. Rowe Price.[15] According to Diamond, she persisted in her request, and, after protracted negotiations, a contract (the "1985 Agreement") was signed on May 20, 1985.

The 1985 Agreement provided that Diamond would receive, for each year of NFFI's existence, a base salary of $100,000. The Agreement also contained two incentive clauses that Diamond believed would generate the majority of her income. One clause accorded Diamond a 12.5% share (the so-called "carried interest") of T. Rowe Price's investment in the fund.[16] The other clause provided that Diamond would receive incentive bonuses tied to the fund's performance relative to the median fund in the Lipper Small Growth Company universe ("Lipper Universe").[17]

The 1985 Agreement also removed Diamond from T. Rowe Price's standard compensation system and its concomitant expec-

10. T. Rowe Price disputes this assertion.

11. During the course of her employment from 1977 to 1985, Diamond regularly received stock options. Diamond exercised the options and promptly sold her shares. Had she held onto the stock, it would be worth approximately $5 million on today's market. *Riepe Affidavit* ¶ 8, Appendix 2, Defendant's Motion for Summary Judgment on Compensation Discrimination and Managing Director Claims.

12. Marcy M. Hallock, Diamond's attorney in the instant litigation, and William D. Gould, Jr., Director of Investment Operations for T. Rowe Price, negotiated Diamond's 1985 employment contract. Gould Affidavit, Appendix 13, Defendant's Motion for Summary Judgment on Compensation Discrimination and Managing Director Claims.

In an earlier proceeding, Ms. Hallock, with Diamond's approval, represented that her testimony concerning the 1985 negotiations was not required for a proper presentation of Diamond's case. On this basis, the Court denied a defense motion to disqualify Ms. Hallock.

13. Appendix 6, Defendant's Motion for Summary Judgment on Compensation Discrimination and Managing Director Claims.

14. *Id.*

15. All other employees at T. Rowe Price are compensated under the standard system.

16. Technically, the 1985 Agreement afforded Diamond the opportunity to purchase this interest. T. Rowe Price loaned her the money interest free. The loan was repaid when the fund was terminated.

17. The Lipper Small Growth Company universe is a nationally recognized index of the stock of small growth companies. The size of Diamond's incentive bonus depended entirely on NFFI's performance relative to the median fund in the Lipper Universe. If NFFI's performance was less than or equal to the median fund in the Lipper Universe, Diamond received no incentive bonus. If NFFI outperformed the median fund by 110% or less, Diamond's bonus was 50% of her assigned interest in NFFI. If NFFI outperformed the median fund by 110% to 125%, Diamond's bonus percentage increased to 80%. Finally, if NFFI outperformed the median fund by 125% or more, Diamond's bonus percentage increased to 120%. 1985 Agreement at 2, Appendix A, Defendant's Motion for Summary Judgment on Compensation Discrimination and Managing Director Claims. Thus, the more NFFI outperformed the median fund in the Lipper Universe, the greater bonus percentage Diamond would receive.

tation of annual cash bonuses and stock options. The contract stated that T. Rowe Price "shall not be obligated to award to [Diamond] any cash bonus, stock bonus or other benefits involving the stock of [T. Rowe Price] except as specifically provided in the Agreement." [18]

Diamond's $100,000 base salary was less than the total compensation (including bonuses and stock options) that she had been receiving under T. Rowe Price's standard compensation system. Confident that the fund would be a success,[19] however, Diamond was willing to assume the risk that she might receive little more than her base salary if NFFI did not perform as she expected.

Under Diamond's management, NFFI performed admirably. In 1989, after five highly successful years, the fund was liquidated and the proceeds distributed to the investors. In that year, Diamond, based upon the objective performance criteria in her contract, received, in addition to her annual salary, a cash distribution of $439,386 and an incentive bonus of $555,446.[20]

While NFFI was winding down, a second limited partnership, New Frontier Fund II ("NFFII"), was created. As reflected in the partnership documents, the new fund, which again featured Diamond as the portfolio manager, mirrored the structure and duration of NFFI. As discussed *infra,* the new fund's stated investment strategy, like NFFI, was to concentrate on small, thinly traded companies with high growth potential.

Diamond raised the partnership's $25 million capital from approximately 15 European investors—some of whom had invested in NFFI. As general partner, T. Rowe Price invested $1 million.[21]

On June 5, 1989, Diamond and T. Rowe Price executed a compensation contract for NFFII (the "1989 Agreement") that was essentially a reiteration of the 1985 Agreement.[22] Diamond's base salary was raised to $130,000. Her carried interest in T. Rowe Price's investment was increased to 13.5%. Diamond was again to receive an incentive bonus if the new fund outperformed the median fund in the Lipper Universe.

The language governing cash bonuses and stock options was somewhat modified. At Diamond's request, the 1989 Agreement provided that T. Rowe Price "shall, from time to time, consider awarding [Diamond] cash bonus, stock bonus and other benefits including the stock of Price Associates, provided, however, that this sentence shall not obligate Price Associates to make any such awards, except as specifically provided in the Agreement." [23]

---

18. 1985 Agreement, Appendix A, Defendant's Motion for Summary Judgment on Compensation Discrimination and Managing Director Claims.

19. Diamond testified on deposition that NFFI was marketed as a vehicle for investing in her stock-picking ability. She had briefly considered naming the fund "The Diamond Fund." Exhibit 1 at 157 and 517, Plaintiff's Opposition to Defendant's Motion for Summary Judgment on Constructive Discharge Claim.

20. Riepe Affidavit ¶ 10, Appendix 2, Defendant's Motion for Summary Judgment on Compensation Discrimination and Managing Director Claims. The cash distribution represented Diamond's carried interest payment, and the incentive bonus reflected NFFI's performance relative to the median fund in the Lipper Universe. T. Rowe Price also profited handsomely from fees and the appreciation on its investment in NFFI.

21. As with NFFI, T. Rowe Price was ultimately responsible for the second fund and again appointed Mathias as its director. Riepe Affidavit ¶ 20(c), Appendix 2, Defendant's Motion for

Summary Judgment on Compensation Discrimination and Managing Director Claims.

22. Seeing no need to retain counsel, Diamond negotiated the 1989 Agreement on her own. Diamond Deposition at 860–61, 867, 870, Exhibit 1, Plaintiff's Opposition to Motion for Summary Judgment on Compensation Discrimination and Managing Director Claims; Diamond Deposition at 853–54, Appendix 1, Defendant's Motion for Summary Judgment on Compensation Discrimination and Managing Director Claims.

23. Diamond received annual bonuses of $20,000, $20,000, and $25,000 in 1987, 1988, and 1989, respectively. Diamond Affidavit ¶ 9, Exhibit 2, Plaintiff's Opposition to Summary Judgment on Compensation Discrimination and Managing Director Claims. She also received a $25,000 annual bonus in 1990. Riepe Affidavit ¶ 12, Appendix 2, Defendant's Motion for Summary Judgment on Compensation Discrimination and Managing Director Claims. Diamond stated that these bonuses were "embarrassingly small." Diamond Deposition at 682, Appendix 1, Defendant's Motion for Summary Judgment on Com-

Unfortunately, NFFII performed poorly. Although the fund gained in 1989 and 1990, it lost over one quarter of its value in 1991.[24] T. Rowe Price labels 1991 an "unmitigated disaster," [25] and Diamond herself admits that 1991 was a "very poor year for the fund." [26]

In 1991, Diamond believed that the stock market was overvalued and due for a downward correction.[27] To take advantage of the anticipated "bear" market, she adopted a "short-selling" strategy. In a successful short sale, the investor borrows an overvalued stock and, anticipating that the stock's price will decline, sells it. The investor repurchases the stock after its price has dropped, returns the stock to its original owner, and pockets the difference. As of December 31, 1991, NFFII had outstanding short positions totalling $32 million in over 85 companies. In comparison, the fund's equity positions (in 35 companies) were valued at $4.3 million.[28]

Diamond was wrong about the market. The downward correction never occurred. Instead, NFFII's portfolio was short in a sustained "bull" market that has carried the major stock indices to all-time highs. In 1991, for example, when NFFII lost more than 25% of its value, the Standard & Poor's 500 stock index rose more than 30%, the NASDAQ Composite rose more than 56%, and the median fund in the Lipper Universe rose more than 51%. NFFII's losses continued in 1992 until the fund was liquidated.[29]

NFFII's poor performance and extensive short sales generated dissatisfaction among a number of the fund's investors. In March 1991, for example, Lisa Boucher of Baring Investment Management Limited wrote that she had invested in NFFII "to gain exposure in small stocks." [30] By shorting so much of the portfolio, Boucher stated, Diamond had "moved aggressively from the mandate" of investing in small, growth companies.[31] Similarly, Susan O'Brien of Framlington Investment Management Limited complained in a letter dated August 14, 1991 that, "instead of investing in smaller growth companies, [NFFII was] involved in selling short the shares of both large and small companies." [32] Her company, O'Brien wrote, was "disturbed at the change in direction of [Diamond's] investment policy." [33] Another investor, Henri Calame of Coges, S.A., wrote to Dia-

---

pensation Discrimination and Managing Director Claims.

24. In 1991, NFFII lost all of the gains it had earlier achieved and was valued slightly less than at its inception in 1989. Diamond Affidavit ¶ 12, Exhibit 2, Plaintiff's Opposition to Summary Judgment on Compensation Discrimination and Managing Director Claims.

25. Plaintiff's Motion for Summary Judgment on Constructive Discharge Claim at 5–6.

26. Appendix 12, Defendant's Motion for Summary Judgment on Constructive Discharge Claim.

27. In a January 20, 1991 letter to investors, Diamond wrote that, although her fundamental analysis of a weak economy in 1991 was correct, a "long bull market" had prevailed. Appreciating stock prices had caused NFFII to lose money because of extensive shorting in the portfolio. "[I]n essence we were wrong [about the market] given the Fund's performance." Diamond Deposition Exhibit 69, Appendix 1, Defendant's Motion for Summary Judgment on Compensation Discrimination and Managing Director Claims.

28. Mathias Affidavit ¶ 9, Appendix 5, Defendant's Motion for Summary Judgment on Compensa-

tion Discrimination and Managing Director Claims.

29. Mathias Affidavit ¶ 10, Defendant's Motion for Summary Judgment on Compensation Discrimination and Managing Director Claims.

30. Appendix 15, Defendant's Motion for Summary Judgment on Constructive Discharge Claim.

31. Id.

32. Appendix 16, Defendant's Motion for Summary Judgment on Constructive Discharge Claim.

As reflected in NFFII's 1991 Annual Report, Diamond had shorted a number of "blue chip" companies, including Coca–Cola, Colgate–Palmolive, Delta Airlines, Walt Disney, General Electric, Proctor & Gamble, Sears–Roebuck, and Time Warner. 1991 Annual Report at 6–7, Appendix 13, Defendant's Motion for Summary Judgment on Constructive Discharge Claim; Diamond Deposition at 1318–19, Appendix 1, Defendant's Motion for Summary Judgment on Constructive Discharge Claim.

33. Id.

mond on June 12, 1991 that his company was "quite upset." [34]

Diamond personally fielded complaints during an investor relations trip to Europe in October and November 1991.[35] She testified on deposition that some investors "told [her] they were unhappy [about NFFII] before [she] even had a chance to introduce [herself]." [36]

Other investors who did not register complaints were concerned nevertheless. This is demonstrated by depositions taken in Europe in connection with this litigation.[37] Richard Martin of Capital House Investment Management Limited testified that "while [NFFII] did have some investment in smaller US companies it also ... was increasingly adopting short positions which would have the effect of negating, or partially negating, that investment." [38] Antony Milford of Framlington Investment Management Limited asserted that "[NFFII] was not doing what we had been led to believe it was going to go when we invested in it. Certainly, if we had known what it was going to do[,] we would not have invested in it." [39] Similarly, Tony Pike of Australian Mutual

Provident Society observed that "[t]he investment had shown the very poor return and the fund appeared to be managed outside the original objectives and intentions of the fund. We saw no point in continuing with it." [40]

Toward the end of 1991, Mathias became increasingly concerned about NFFII. He knew that the fund was losing value in a rising market. Reports of investor dissatisfaction had reached him. He also learned that investors were tendering their shares for redemption.[41]

The requests for redemption presented a problem because, under the NFFII governing documents, only 5% of the outstanding shares could be redeemed in any single year. As of December 31, 1991, however, approximately 10% of the outstanding shares had been tendered.[42] Because of the 5% provision, some investors would be "locked" into the partnership against their will.

These factors troubled Mathias, who was concerned about damage to T. Rowe Price's reputation in the European investment community. He was also worried about the threat of litigation against T. Rowe Price.[43]

34. Appendix 1 at Exhibit 97, Defendant's Motion for Summary Judgment on Constructive Discharge Claim.

35. Diamond Deposition at 1427, Defendant's Motion for Summary Judgment on Constructive Discharge Claim.

36. Diamond Deposition at 1437, Defendant's Motion for Summary Judgment on Constructive Discharge Claim; see also id. at 1436–40, 1504, 1507, 1513–14, 1529–30.

37. The parties deposed some but not all of NFFII's European investors. The number of depositions was not dictated by the Court but left entirely to the discretion of the parties.

38. Appendix 8 at 7, Defendant's Motion for Summary Judgment on Constructive Discharge Claim.

39. Appendix 9 at 5, Defendant's Motion for Summary Judgment on Constructive Discharge Claim.

40. Appendix 10 at 7, Defendant's Motion for Summary Judgment on Constructive Discharge Claim.

41. Mathias Affidavit ¶ 13, Appendix 5, Defendant's Motion for Summary Judgment on Com-

pensation Discrimination and Managing Director Claims.

42. Investors had tendered 325,500 shares while only 127,437 shares could be redeemed. Notice of Special General Meeting of Shareholders and Redemption Election at 5, Appendix F, Defendant's Motion for Summary on Constructive Discharge Claim.

43. Mathias was concerned that Diamond's short selling contradicted many statements of investment purpose contained in documents relating to NFFII. Mathias testified:

"Diamond had engaged in such extreme shorting in a portfolio that had been represented to the investors as a vehicle for investing in small emerging growth companies."
Mathias Affidavit ¶ 13, Appendix 11, Defendant's Motion for Summary Judgment on Constructive Discharge Claim.
The Private Placement Memorandum and other documents that attended NFFII's formation include the following statements of purpose:
* "[I]nvestments will be long-term in nature."
NFFII Private Placement Memorandum at 13, Appendix B, Defendant's Motion for Summary Judgment on Constructive Discharge Claim.
* "The Partnership will seek superior investment returns through direct investment in

As a result of these concerns, Mathias, with the assent of the firm's Management Committee, assumed a more active role in directing the fund's affairs.[44] In early January 1992, he ordered Diamond not to increase the net short position[45] of NFFII.[46] Diamond viewed the order as undermining her authority[47] but complied nevertheless.[48]

On January 10, 1992, Diamond circulated to the firm's Management Committee the draft of a letter she proposed sending to NFFII investors before they received the upcoming quarterly report. In the sixth paragraph of that letter, Diamond wrote that "the Fund's portfolio is no longer being ac-

> small United States public companies (i.e., companies with an equity market capitalization at the time of investment generally of $50 million or less and pre-tax income below $5 million) with high growth potential."
> NFFII Private Placement Memorandum at 5, Appendix B, Defendant's Motion for Summary Judgment on Constructive Discharge Claim.
> * "[NFFII] will invest in very small, uninstitutionalized growth stocks."
> Letter from Diamond to prospective NFFII investor, Appendix 4, Defendant's Motion for Summary Judgment on Constructive Discharge Claim.
> * "[NFFII] will seek superior investment returns through direct investment in small United States public companies."
> 1989 Agreement, Appendix 7, Defendant's Motion for Summary Judgment on Constructive Discharge Claim.

44. Mathias Affidavit ¶ 13, Appendix 11, Defendant's Motion for Summary Judgment on Constructive Discharge Claim.

45. The "net short position" refers to the percentage of the portfolio's value tied up in shorted stock. *See* Mathias Affidavit ¶ 15, Appendix 11, Defendant's Motion for Summary Judgment on Constructive Discharge Claim.

46. Mathias Affidavit ¶ 15, Appendix 11, Defendant's Motion for Summary Judgment on Constructive Discharge Claim; Mathias Memorandum to NFFI File, Exhibit 2, Bates Stamp 004904, Plaintiff's Opposition to Summary Judgment on Constructive Discharge Claim (document incorrectly marked on face as "Exhibit 1"; not listed in Index of Exhibits; located between Exhibit 2 and Exhibit 3).

47. Diamond does not assert that she was prevented from exercising *any* control over the investments in NFFII. She alleges that, for the first time, her control of the fund was fettered. Several T. Rowe Price employees, including Diamond's trader Alan R. Stuart, testified that Diamond could and did continue to short stock as

tively managed by me" and "the performance of 1992 will not reflect a portfolio as I would structure it."[49]

On January 13, 1992, George J. Collins, the Chief Executive Officer of T. Rowe Price,[50] sent his secretary to Diamond's office with a memorandum which directed Diamond not to mail out the draft.[51] The Collins memorandum also expressly forbade Diamond from "faxing, writing, telephoning, or in any other way communicating with [her] clients."[52] Collins wrote that the "matter will be discussed at the Management Committee shortly" and that Diamond "will wait for [the Committee's] reply."[53] Further, while the

> well as buy and sell stock. Stuart Affidavit ¶ 3, Appendix 20, Defendant's Motion for Summary Judgment on Constructive Discharge Claim. Diamond was not limited in taking additional short positions so long as she did not increase the fund's "net short position"—that is, the percent of the fund's investment devoted to short sales.

48. Diamond concedes that Mathias and T. Rowe Price genuinely believed that there were problems with NFFII. As will be discussed *infra*, however, Diamond criticizes T. Rowe Price for overreacting to the problems and asserts that the firm would have handled the situation differently had Diamond been male.

49. Diamond Deposition Exhibit 67, Appendix 1, Defendant's Motion for Summary Judgment on Constructive Discharge Claim.

50. On page 23 of its Motion for Summary Judgment on Constructive Discharge Claim, T. Rowe Price asserts that George Collins was the CEO in 1992. Yet James S. Riepe states in his affidavit that George Roche has been the CEO since 1984. Riepe Affidavit ¶ 18(a), Exhibit 2, Defendant's Motion for Summary Judgment on Compensation Discrimination and Managing Director Claims. The Court need not decide this historical fact and notes this discrepancy only to explain any references hereinafter to George Roche as the CEO of T. Rowe Price.

51. Deposition Exhibit 68, Appendix 1, Defendant's Motion for Summary Judgment on Constructive Discharge Claim.

52. *Id.*

53. *Id.*

Diamond testified that the Management Committee never contacted her about the letter. Diamond Affidavit ¶ 6, Exhibit 2, Plaintiff's Opposition to Summary Judgment on Constructive Dis-

secretary watched, Diamond was required to sign the Collins' memorandum, thus indicating that she would abide by his order.[54]

On or about January 10, 1992, Mathias left for California on business.[55] He was accompanied by Brooks Carey, a T. Rowe Price Vice President who was knowledgeable about the European investment community and who had contacts with some of NFFII's investors. While in California and again during a later trip to New York, Carey telephoned several of the fund's limited partners for the purpose of determining the degree of investor dissatisfaction. Diamond was informed about Carey's contact with NFFII clients after Mathias' return to Baltimore on January 15th or 16th.[56]

Carey reported the substance of his phone calls to the Management Committee, stating that some investors were displeased with the fund's management and performance.[57] The Management Committee determined that Mathias and Carey should travel to Europe and meet the investors personally. According to Mathias, the purpose of the trip was to determine whether the investors were interested in continuing with the fund as structured or whether they wished to amend the

redemption provisions of the Private Placement Memorandum to permit liquidation.[58] In February 1992, Mathias told Diamond that he and Carey would interview some of NFFII's investors in Europe.

Diamond's request to accompany Mathias and Carey on their European trip was refused. At oral argument, counsel for T. Rowe Price represented that the firm believed that investors would be more candid about their concerns without Diamond present.[59]

Diamond asserts that the trip had an ulterior purpose: to market another T. Rowe Price fund to NFFII's investors in an effort to engineer the liquidation of NFFII and force the resignation of Diamond. This fund, the Strategic Partners Fund, was headed by David Warnock, another Vice President at T. Rowe Price. The plan, Diamond contends, was to give NFFII investors the impression that her fund was being poorly managed, prompting them to withdraw their money and invest in Strategic Partners.[60] Diamond also contends that T. Rowe Price, by engineering the liquidation of NFFII, aimed to

charge Claim. On January 20, 1992, however, Diamond was permitted to mail a letter to NFFII investors. The letter, minus the controversial sixth paragraph, was virtually identical to the proposed letter dated January 10. According to Diamond, T. Rowe Price deleted the paragraph because "it would not look nice ... if T. Rowe Price and [she] were having a disagreement.... [I]t would not look nice to the client." Diamond Deposition at 1321, Appendix 1, Defendant's Motion for Summary Judgment on Constructive Discharge Claim. *Compare* Appendix 12, Defendant's Motion for Summary Judgment on Constructive Discharge Claim (January 20 letter actually mailed to NFFII clients) *with* Appendix 1 at Exhibit 67, Defendant's Motion for Summary Judgment on Constructive Discharge Claim (January 10 draft sent to Management Committee).

54. *Id.*

55. Diamond alleges that Mathias assured her before he left that he would not contact the NFFII investors. Exhibit 9 at Bates Stamp 0004, Plaintiff's Opposition to Summary Judgment on Constructive Discharge Claim. Diamond admits that James S. Riepe had already told her that the NFFII investors would have to be contacted but that it would have to be done "very carefully." *Id.*

56. *Id.*

57. Diamond disputes the level of dissatisfaction among the NFFII investors and indicates that some investors were not worried about the fund's performance. Because only some of the investors were deposed, the record is incomplete on this point. It is not material to these motions, however, to determine the precise level of dissatisfaction among the clients. Diamond herself concedes that some of the investors were displeased and that T. Rowe Price genuinely believed that the fund was troubled. Additionally, when given a vote, approximately 90% of outstanding shares were cast in favor of terminating the fund, which constitutes unassailable evidence that the crisis of investor confidence was real and not a product of the imagination of T. Rowe Price.

58. Mathias Affidavit ¶¶ 14, 16, Appendix 11, Defendant's Motion for Summary Judgment on Constructive Discharge.

59. *See also* Mathias Affidavit ¶¶ 16–17, Appendix 11, Defendant's Motion for Summary Judgment on Constructive Discharge Claim.

60. Plaintiff's Opposition to Summary Judgment on Constructive Discharge Claim at 23.

force her to resign.[61] During oral argument, Diamond's counsel asserted that the efforts of Mathias, Carey, and Warnock amounted to a "conspiracy."

There is no evidence in the record of such a conspiracy, however. Mathias, Carey, and Warnock testified without contradiction that they made no effort either to market Strategic Partners to NFFII investors or to persuade NFFII investors to withdraw, liquidate, or redeem their shares. The deposition testimony of the European investors fully supports their testimony.

Only once did Warnock, who was coincidentally on a marketing trip of his own in Europe, meet an NFFII investor. One night when Mathias, Carey, and Warnock were staying in the same hotel, Mathias asked Warnock to join him, Carey, and Richard Martin of Capital House Investment Management Limited for dinner. On deposition, Martin testified that Warnock joined the dinner group only *after* the discussions about NFFII had concluded.[62] Diamond produced no evidence that Mathias and Carey attempted to sell Strategic Partners to Martin.

Carey stated on deposition that the name of Warnock's fund may have arisen in passing during the dinner conversation.[63] A token reference to the work of a dinner companion, however, demonstrates polite manners and natural curiosity more than any conspiracy theory.[64] In fact, Martin was never telephoned by Warnock nor sent any information about investing in Strategic Partners.[65]

Diamond also claims that, during the European trip, Mathias and Carey offered Anthony Pike, another NFFII investor, the opportunity to swap his NFFII investment with an investment in Warnock's fund. This claim, however, is completely unsupported by any evidence. Pike testified that T. Rowe Price had briefly discussed the possibility of investment opportunities through the firm.[66] Neither David Warnock nor his fund, however, was ever mentioned.[67]

Mathias returned from Europe in early March 1992[68] and reported to the Manage-

61. *Id.* at 36.

62. Martin Deposition at 39–40, Appendix 8, Defendant's Reply to Plaintiff's Opposition to Summary Judgment on Constructive Discharge Claim.

63. Carey Deposition at 302, Exhibit 10, Plaintiff's Opposition to Summary Judgment on Constructive Discharge Claim.

64. Warnock testified on deposition that he was asked to join the three men for dinner because "Ed, Brooks, and I were staying in the same hotel, and it was the end of a long day and we were having dinner." Appendix 6 at 92, Defendant's Reply to Plaintiff's Opposition to Summary Judgment on Constructive Discharge Claim.

65. Martin Deposition at 44, Exhibit 5, Plaintiff's Opposition to Summary Judgment on Constructive Discharge Claim.

66. Pike Deposition at 17, Exhibit 6, Plaintiff's Opposition to Summary Judgment on Constructive Discharge Claim.

67. *Id.*

68. Diamond also complains that, also in early March 1992, T. Rowe Price, in another attempt to force her to resign, transferred her research assistant, Randi Kitt, to a different department. Diamond points to a memorandum dated March 2, 1992 from Kitt explaining that she had been offered a new position within the firm and that she planned to accept it. Diamond Deposition Exhibit 56, Appendix 1, Defendant's Motion for Summary Judgment on Constructive Discharge Claim.

The evidence, however, flatly refutes Diamond's theory that the transfer of Kitt was part of a plan to force her to resign. First, Diamond was not deprived of Kitt's services. Kitt remained assigned to NFFII through its liquidation. In April 1992, only *after* Diamond had left the firm, did Kitt begin to work within another department. Kitt Deposition at 81–82, Appendix 21, Defendant's Motion for Summary Judgment on Constructive Discharge Claim.

Second, Kitt herself initiated the transfer because she was dissatisfied with Diamond's investment strategy. Kitt testified on deposition that, under Diamond's tutelage, she was learning very little about individual growth companies. *Id.* at 54–55. Kitt sought to follow the stocks of a limited number of small companies over the long term so that she could become knowledgeable about them, their industries, and their management. *Id.* at 55. By contrast, Diamond was focused on short selling and quick turn over of stock in NFFII's portfolio. *Id.* at 54–55, 64–65, 70. Diamond's investment strategy frustrated Kitt, who testified on deposition that "the learning curve had flattened out for [her]." *Id.* at 54.

ment Committee. The firm decided that the best way to handle the situation would be to allow the investors themselves to determine whether the fund should continue. Mathias informed Diamond that NFFII investors would be given the opportunity to vote on whether the 5% redemption limitation should be amended to permit liquidation of the partnership.[69]

T. Rowe Price prepared proxy materials, which were sent to all NFFII limited partners. The vote was held on March 9th, and the results became official on March 20th. Approximately 90% of the shares voted by the investors were cast in favor of all matters presented,[70] including amending the bylaws to permit a special March 31st redemption without the 5% redemption limitation.[71] NFFII investors also overwhelmingly elected to redeem all shares and withdraw their money from NFFII.[72]

> As early as November 1991, therefore, Kitt had begun to look for employment outside T. Rowe Price because she did not believe that she would be transferred within the firm. *Id.* at 65. Kitt also feared reprisal from Diamond if her desire to work elsewhere became known. *Id.* at 55. Only after an outside firm had indicated an interest in hiring Kitt did she approach T. Rowe Price management to state her interest in being transferred to another department within T. Rowe Price. *Id.* at 64–66.
>
> Finally, there was nothing sinister about the timing of Kitt's transfer in April 1992. She was originally hired in February 1990 for a two-year position that was due to expire in February 1992. *Id.* at 58, 80. Thus, Kitt's job search in the winter of 1991–92 merely coincided with NFFII's problems.

**69.** Mathias also allegedly told Diamond that the "situation was worse than expected." Exhibit 15 at Bates Stamp 42, Plaintiff's Opposition to Summary Judgment on Constructive Discharge Claim. Diamond contests the accuracy of Mathias' pessimistic assessment. Plaintiff's Opposition to Summary Judgment on Constructive Discharge Claim at 25–26. The Court analyzes this dispute *infra.*

**70.** As of March 20, proxies representing 2,467,-179 shares of the total 2,548,752 shares outstanding had been received. Mathias Affidavit ¶ 19, Appendix 11, Defendant's Motion for Summary Judgment on Constructive Discharge Claim.

**71.** Mathias Affidavit ¶ 19, Appendix 11, Defendant's Motion for Summary Judgment on Constructive Discharge Claim.

Diamond did not report for work on Friday, March 20, or Monday, March 23. On Tuesday, March 24, Diamond came to work and met with Mathias and Lucy Robbins, a staff lawyer for T. Rowe Price who had worked on NFFII legal matters. Robbins informed Diamond that the investors had voted to liquidate the fund. Diamond responded by asking, "What about me?" Mathias then questioned, "What about you?" Diamond countered by saying, "What about me? This is constructive discharge."[73] Robbins then replied, "Go talk to Andy Goresh."[74]

Diamond was then asked whether she wanted to assist in the fund's liquidation, a process that would involve several weeks of work. Diamond replied said that she wanted some time to consider the proposition.[75] Diamond, however, left work on that day and never returned.[76]

**72.** *Id.*

**73.** Diamond alleges that Mathias' and Robbins' failure to deny her statement that she had been constructively discharged constitutes an implicit affirmation that she was being terminated.

**74.** The reference to see Goresh, Diamond opines, shows that she was being fired. Robbins' statement supports no such inference. Andrew C. Goresh, Vice President for Human Resources at T. Rowe Price, was responsible for hiring and firing most employees; he lacked the authority, however, to fire anyone at the vice president level or higher. Diamond was a Vice President.

> Further, according to Diamond's own notes, Diamond had already received some assurances of continued employment from two top level managers at T. Rowe Price. James S. Riepe told Diamond in January 1992 that "they hoped that [she] could stay on in some capacity." Exhibit 9 at Bates Stamp 0002, Plaintiff's Opposition to Summary Judgment on Constructive Discharge Claim. Further, in March 1992, George Roche, CEO and Director of T. Rowe Price, assured Diamond that she would not be fired for having a bad year, remarking that he also had a poor year in 1991. Appendix 19, Defendant's Motion for Summary Judgment on Constructive Discharge Claim.

**75.** Diamond Deposition at 1156, 1486, Appendix 1, Defendant's Motion for Summary on Constructive Discharge Claim; Mathias Affidavit ¶ 20, Appendix 11, Defendant's Motion for Summary on Constructive Discharge Claim.

**76.** The record is devoid of any direct evidence that T. Rowe Price ever discussed or planned to

Later that same day (March 24, 1992), Diamond filed a charge of gender and religious discrimination with the EEOC. Specifically, Diamond alleged discriminatory wages and discharge as well as failure to be promoted. Diamond filed her first complaint in this Court on April 16, 1992, alleging violations of the Equal Pay Act. The EEOC issued a right to sue letter dated June 2, 1992. In it, the agency stated that the EEOC had terminated any further processing of Diamond's charge and would not conduct an investigation.[77] In June 1992, Diamond filed an amended complaint in this Court, adding Title VII allegations to the Equal Pay Act claims. The Court authorized Diamond to proceed on the amended complaint in July 1992.

On August 13, 1993, the Court ordered the plaintiff to modify her two-count complaint to reflect this Court's prior rulings on other motions for summary judgment filed by the defendant.[78] The Court had already ruled that the claims in Count I alleging violations of the Equal Pay Act were limited to compensation received up to three years prior to April 16, 1992, the date on which this instant case was filed. Additionally, the Court had already ruled that the claims in Count II alleging violations of Title VII were limited to (1) failure to be promoted to Managing Director, (2) unequal pay received up to two years prior to March 24, 1992, the date Diamond filed her EEOC charge, and (3) Diamond's alleged constructive discharge on March 24, 1992.[79]

The Court now addresses the several summary judgment motions filed by both parties.

### III. DISCUSSION

#### A. Standard for Summary Judgment

■■■ Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). That is, Rule 56 mandates the entry of summary judgment against a party who, after reasonable time for discovery and upon motion, "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. "[A] complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial[,] [and] [t]he moving party is 'entitled to judgment as a matter of law.'" Id. at 323, 106 S.Ct. at 2553 (citations omitted).

The moving party bears the burden of demonstrating the absence of any genuine issue of material fact. Adickes v. S.H. Kress & Co., 398 U.S. 144, 157, 90 S.Ct. 1598, 1608,

---

terminate Diamond's employment. T. Rowe Price had not focused on what role Diamond might play after the liquidation of NFFII. Indeed, until the shareholders' vote, any decision about Diamond's future would have been premature because the investors could well have voted to continue the fund. In any event, Diamond left T. Rowe Price before giving the firm a chance to negotiate a new assignment.

**77.** There is no evidence that the EEOC ever conducted an investigation of Diamond's charge. See Memorandum of the Court at 13 n. 11 (dated Aug. 13, 1993).

**78.** On August 13, 1993, the Court granted in part and denied in part two defense motions for partial summary judgment. In addition to the rulings described infra, the Court struck certain paragraphs from the amended complaint and ordered the plaintiff to file a second amended complaint, which was done on August 16, 1993.

**79.** The Court also held that the plaintiff could pursue the continuing violation theory only in relation to her claims of failure to be promoted and compensation discrimination. Further, regarding the former claim, the Court ruled that the plaintiff could compare herself to all individuals who had been named Managing Directors.

On November 12, 1993, Diamond filed a Motion for Reconsideration of the Court's Order of August 13, 1993. Diamond asked the Court to reconsider its earlier rulings that certain allegations were not actionable—namely, Diamond's not being featured in a T. Rowe Price newsletter, not being included in social events, and not having an office similar to her male comparators. Pursuant to Local Rule 105.10, the Court declines Diamond's invitation and shall deny her motion for reconsideration. Alternatively, even if these allegations were considered "new evidence" under Fed.R.Civ.P. 60(b), they are neither intolerable working conditions nor do they suggest an intent to force Diamond to resign.

26 L.Ed.2d 142 (1970); *Charbonnages de France v. Smith*, 597 F.2d 406, 414 (4th Cir.1979). In determining whether there is a genuine issue of material fact, the Court must view the facts, and all reasonable inferences to be drawn from them, in the light most favorable to the non-moving party. *Pulliam Inv. Co. v. Cameo Properties*, 810 F.2d 1282, 1286 (4th Cir.1987); *Ross v. Communications Satellite Corp.*, 759 F.2d 355 (4th Cir.1985).

If the evidence favoring the non-moving plaintiff is "merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986) (citations omitted). Unsupported speculation is insufficient to defeat a motion for summary judgment. *Felty v. Graves–Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir.1987) (citing *Ash v. United Parcel Serv., Inc.*, 800 F.2d 409, 411–12 (4th Cir.1986)). Moreover, the mere existence of some factual dispute is insufficient to defeat a motion for summary judgment; there must be a genuine issue of material fact. *Anderson*, 477 U.S. at 247–48, 106 S.Ct. at 2509–10.

Material factual disputes are "genuine" only if a reasonable jury could return a verdict for the non-moving party based upon the record as a whole. *Id.* at 248–49, 106 S.Ct. at 2510–11. "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Id.* at 252, 106 S.Ct. at 2512. The Court must determine whether, when viewing the evidence in the light most favorable to the non-moving party, "a fair-minded jury could return a verdict for the [non-movant]." *Anderson*, 477 U.S. at 252, 106 S.Ct. at 2512.

With these principles in mind, the Court will first decide summary judgment as to the three claims in the second amended complaint. The Court will then consider summary judgment as to the six-count amended counterclaim.

### B. *Compensation Discrimination*

Diamond alleges compensation discrimination under both the Equal Pay Act (the "EPA") and Title VII. The analysis of such a claim under either statute is similar but not identical. The EPA targets gender-based compensation discrimination exclusively, while Title VII redresses workplace discrimination in general. That is, whether based on gender, race, religion, or national origin, a Title VII claim can be used to challenge discriminatory hiring, promotion, discharge, compensation, or other employment practices.

Under the EPA, a prima facie case requires proof (1) that an employer is paying different wages to employees, (2) of the opposite sex, (3) for equal work. 29 U.S.C. § 206(d)(1); *Hassman v. Valley Motors, Inc.*, 790 F.Supp. 564, 567 (D.Md.1992). If the plaintiff establishes these elements, the burden then shifts to the employer to prove that the differential in wages is justified by one of four affirmative defenses.

The affirmative defenses are: (1) a seniority system; (2) a merit system; (3) a system pegging earnings to quality or quantity of production; or (4) any factor other than sex. 29 U.S.C. § 206(d)(1)(i)–(iv); *Hassman*, 790 F.Supp. at 567 (citing *Keziah v. W.M. Brown & Son, Inc.*, 888 F.2d 322, 324 (4th Cir. 1989)); *see also Corning Glass Works v. Brennan*, 417 U.S. 188, 196–97, 94 S.Ct. 2223, 2229, 41 L.Ed.2d 1 (1974).

If an employer is unable to establish a defense, then it is liable. The EPA, therefore, establishes a form of strict liability. A plaintiff is not required to prove that the employer consciously decided to pay the plaintiff unequal wages because of her gender.[80] *Hassman*, 790 F.Supp. at 567.

---

**80.** Under Title VII, however, intent is relevant. A plaintiff must ultimately prove that the challenged employment practices were the product of conscious discrimination.

By establishing a prima facie violation of Title VII, a plaintiff raises an inference of discrimina-

tory intent. *McDonnell Douglas v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). Although proof of discriminatory motive or intent is critical under Title VII, "it can in some circumstances be inferred from the mere fact of differences in treatment." *Interna-*

Prior to Supreme Court's decision in *County of Washington v. Gunther*, 452 U.S. 161, 101 S.Ct. 2242, 68 L.Ed.2d 751 (1981), the analysis of a compensation discrimination claim under the EPA and Title VII was identical. *EEOC v. Sears, Roebuck & Co.*, 839 F.2d 302, 340 (7th Cir.1988). In *Gunther*, however, the Supreme Court held that a plaintiff claiming wage discrimination under Title VII need not satisfy the EPA's "equal work" requirement [81] in order to establish a prima facie violation.[82] 452 U.S. at 181, 101 S.Ct. at 2254. Otherwise, "a woman who is discriminatorily underpaid could obtain no relief—no matter how egregious the discrimination might be—unless her employer also employed a man in an equal job in the same establishment, at a higher rate of pay." [83]

tional Bhd. of Teamsters v. United States, 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 1854 n. 15, 52 L.Ed.2d 396 (1977); *Grove v. Frostburg Nat'l Bank*, 549 F.Supp. 922, 938 (D.Md.1982); *see also Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 986, 108 S.Ct. 2777, 2784, 101 L.Ed.2d 827 (1988). Evidence of intent may be either direct or circumstantial. It should be noted that circuit courts of appeals differ on the admissibility of statistics as circumstantial evidence to prove intentional gender-based discrimination. *See, e.g., EEOC v. Sears, Roebuck & Co.*, 839 F.2d 302, 342–43 (7th Cir.1988) (rejecting exclusive use of statistical evidence to prove systematic wage discrimination).

If the Title VII plaintiff makes a threshold showing raising an inference of discriminatory intent, the burden then shifts to the employer to "articulate some legitimate nondiscriminatory reason" for the challenged employment action. *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824. If the employer does so, the plaintiff then bears the ultimate burden of proving by a preponderance of the evidence that the proffered legitimate reason was a mere pretext for an illegal motive. *Id.* at 804, 93 S.Ct. at 1825; *see also Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093–94, 67 L.Ed.2d 207 (1981).

Some types of Title VII discrimination claims have well-established prima facie elements. In a failure to promote case, for example, a plaintiff must prove that he or she (1) is a member of a protected group; (2) applied for the position in question; (3) was qualified for the position; and (4) was rejected for the position in favor of someone not a member of the protected group under circumstances giving rise to an inference of unlawful discrimination. *Alvarado v. Board of Trustees of Montgomery Community College*, 928 F.2d 118, 121 (4th Cir.1991). The Supreme Court's decision in *County of Washington v. Gunther*, however, has created some uncertainty among the lower courts as to the elements of a prima facie case in a compensation claim. 452 U.S. 161, 101 S.Ct. 2242, 68 L.Ed.2d 751 (1981).

**81.** In the view of the Fourth Circuit, "equal work" need be only "substantially equal." *Brennan v. Prince William Hosp. Corp.*, 503 F.2d 282, 285 (4th Cir.1974) (asserting that a plaintiff must prove "substantial equality of skill, effort, and responsibility as the jobs are actually performed"), *cert. denied*, 420 U.S. 972, 95 S.Ct. 1392, 43 L.Ed.2d 652 (1975); *Soble v. University of Maryland*, 778 F.2d 164, 167 (4th Cir.1985) (citing *Brennan*); *Brewster v. Barnes*, 788 F.2d 985, 991 (4th Cir.1986) (citing *Brennan*). Judges in this Court have similarly interpreted equal work as requiring only substantial equality. *Cherrey v. Thompson Steel Co.*, 805 F.Supp. 1257, 1262 (D.Md.1992); *Hassman v. Valley Motors, Inc.*, 790 F.Supp. 564, 567 (D.Md.1992); *Monroe–Lord v. Hytche*, 668 F.Supp. 979, 995 (D.Md. 1987), *aff'd*, 854 F.2d 1317 (4th Cir.1988); *Grove v. Frostburg Nat'l Bank*, 549 F.Supp. 922, 933 (D.Md.1982).

**82.** In *Gunther*, the Supreme Court also held that the Bennett Amendment incorporated the four affirmative defenses of the EPA into Title VII for wage discrimination claims. *Id.* at 168, 101 S.Ct. at 2247.

**83.** In the aftermath of *Gunther*, some circuit courts of appeals have attempted to develop a framework for a prima facie Title VII compensation discrimination claim that dispenses with the equal work requirement. Under traditional Title VII analysis, a plaintiff alleging racial discrimination must make an initial showing that, for example, a white employee was hired for the job, that white employees were promoted, or that white employees were not laid off. After *Gunther*, it is unclear how a Title VII plaintiff makes a prima facie showing when there are no similarly situated employees.

Courts have responded to this issue differently. The First Circuit has expressed doubt whether *Gunther* precludes requiring a showing of equal work in any Title VII compensation discrimination claim. *Marcoux v. State of Me.*, 797 F.2d 1100, 1105–06 (1st Cir.1986). Other federal appellate courts, such as the Fourth and Eleventh Circuits, view *Gunther* as dispensing with the equal work requirement only when direct evidence of discriminatory intent already exists. *Soble v. University of Md.*, 778 F.2d 164, 167 (4th Cir.1985); *EEOC v. Reichhold Chemicals, Inc.*, 988 F.2d 1564, 1569–70 (11th Cir.1993). These courts appear to have adopted the position of Justice Rehnquist, who dissented in *Gunther*: "[A]ll we may conclude is that even absent a showing of equal work, there is a cause of action under Title VII where there is direct evidence that an employer has *intentionally* depressed a woman's salary because she is a woman." *Gunther*, 452 U.S. at 204, 101 S.Ct. at 2265 (original emphasis).

*Id.* at 178, 101 S.Ct. at 2252. That is, "if an employer hired a woman for a unique position in the company and then admitted that her salary would have been higher had she been male, the woman would be unable to obtain legal redress...." 452 U.S. at 178–79, 101 S.Ct. at 2252.

■ In this case, the Court need not decide whether Diamond has established a prima facie case of compensation discrimination under either the EPA or Title VII because two of the four affirmative defenses, which apply equally to both statutes, preclude Diamond's compensation discrimination claim altogether.[84] *See* 42 U.S.C. § 2000e–2(h); *Gunther,* 452 U.S. 161, 101 S.Ct. 2242, 68 L.Ed.2d 751 (1981); *Brewster,* 788 F.2d at 991–92. These two affirmative defenses are: (1) quality/quantity of production and (2) factor other than sex.

A compensation system qualifies for the affirmative defenses of quantity/quality of production or factor other than sex if the employer determines bonuses, commissions, or salaries according to performance-based or other objectively verifiable criteria.[85] The following cases applying these affirmative defenses are instructive:

Commissions were paid to employees according to a standard rate. *Schutz v. Western Publishing Co.,* 609 F.Supp. 888 (N.D.Ill.1985).

Salary levels were based on revenue of district (quantity of production); a merit and seniority system determined salaries within each level; entire system also entitled to factor other than sex defense. *Brownlee v. Gay & Taylor, Inc.,* 642 F.Supp. 347 (D.Kan.1986), *aff'd,* 861 F.2d 1222 (10th Cir.1988).

Management Incentive Program determined bonuses according to each manager's quarterly profit/loss report. *Bullock v. Pizza Hut, Inc.,* 429 F.Supp. 424, 430–31 (M.D.La.1977).

Wage differential between two employees justified because one employee had greater work experience than the other.[86] *EEOC v. Aetna Ins. Co.,* 616 F.2d 719 (4th Cir. 1980).

Pay differential was justified because of greater skill, responsibility, experience, and qualifications. *Hassman v. Valley Motors, Inc.,* 790 F.Supp. 564 (D.Md.1992).

■ Before analyzing Diamond's claim, it is necessary to state the precise nature of her complaint. Diamond concedes that the 1985 and 1989 Agreements were valid employment contracts that she voluntarily signed after arm's length bargaining over the contractual terms. She does not allege that her stated annual salary under the Agreements was discriminatory. Diamond also concedes that T. Rowe Price correctly calculated and remitted her carried interest and

---

**84.** The EPA affirmative defenses apply equally to Title VII wage claims. *Gunther,* 452 U.S. at 171, 101 S.Ct. at 2249. Thus, an affirmative defense to one statute is an affirmative defense to both statutes. *Fallon v. State of Ill.,* 882 F.2d 1206, 1213 (7th Cir.1989). Moreover, *Gunther's* holding that a plaintiff in a wage claim under Title VII need not show equal work does not affect the Court's analysis of the affirmative defenses.

**85.** The affirmative defenses can overlap so that a performance-based compensation plan may qualify under both the quality/quantity and the factor other than sex affirmative defenses. *See Brownlee v. Gay & Taylor, Inc.,* 642 F.Supp. 347 (D.Kan.1986), *aff'd,* 861 F.2d 1222 (10th Cir. 1988).

**86.** *See also Ratts v. Business Systems, Inc.,* 686 F.Supp. 546 (D.S.C.1987) (wage differential justified because of different duties and salary "freeze" dictated by adverse economic conditions).

There is the further complication of the EEOC regulations, which provide that "[i]n situations where the jurisdictional prerequisites of both the [EPA] and Title VII ... are satisfied, any violation of the [EPA] is a violation of Title VII." 29 C.F.R. § 1620.27. This statement does not adequately account for the confusing interplay between the burdens of proof under *McDonnell Douglas/Burdine* and the prima facie case under the Equal Pay Act. That is, under Title VII, an employer merely has a burden of production, not persuasion, on the non-pretextual reason for the discharge. The ultimate burden of persuasion remains with the plaintiff at all times. *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093–94. Under the EPA, on the other hand, the burden of persuasion shifts to the employer regarding the affirmative defenses. Because the EEOC's regulations do not address these differences, the Seventh Circuit declined to accord the EEOC its normal degree of deference. *Fallon v. State of Ill.,* 882 F.2d 1206, 1217–19 (7th Cir.1989).

incentive bonus payments under the contracts. Diamond's sole contention is that her employer failed to exercise its discretion to award her additional compensation. Had she been a Gentile male, Diamond alleges, T. Rowe Price would have granted her stock options and larger annual bonuses.[87]

Diamond's claim fails as matter of law. As an initial matter, it is contrary to the concept behind the 1985 and 1989 Agreements. Before the 1985 Agreement, as previously discussed, Diamond was compensated under T. Rowe Price's standard system. Upper echelon employees such as Diamond received an annual salary as well as stock options and an annual bonus as determined by T. Rowe Price's Management Committee. Diamond considered this system an anachronism within the investment industry because her pay was not linked to performance-based criteria. She also believed that this system, which vested discretion in the firm's Compensation Committee, discriminated against her as a Jewish female.

Diamond, therefore, bargained for the carried interest and incentive bonus structure incorporated in the 1985 and 1989 Agreements. Diamond stated on deposition that by doing so she "led [T. Rowe Price] from the dark ages into the real investment world," [88] thereby contributing to the "modernization" of T. Rowe Price.

In a letter to the Management Committee dated March 29, 1985, Diamond wrote that, "[r]egarding the issue of incentive compensation, the intent is to provide a mechanism whereby my incentive compensation (which I see representing the majority of my total compensation) would be linked to the New Frontier's Fund's performance." [89] She suggested "reducing or freezing [her] salary at current levels." [90] Additionally (and perhaps most significantly), Diamond stated that she *"would expect little or no bonus on an annual basis for the life of the New Frontier Fund."* [91]

Thus, Diamond's goal was to move away from a subjective compensation system into an objective one. The 1985 and 1989 Agreements accomplished this goal through a formula that determined her income by the absolute growth of the funds under her management (the carried interest) and the relative performance of her funds against the Lipper Universe.[92] These payments were to be calculated and awarded upon the liquidation of each fund.

Diamond's claim also contradicts the clear and unambiguous language of the contracts she signed.[93] Neither compensation package entitled Diamond to annual bonuses or stock options. To the contrary, the 1985 Agreement unequivocally states that T. Rowe Price *"shall not be obligated to award to [Diamond] any cash bonus, stock bonus or other benefits involving the stock of [T. Rowe*

---

**87.** Diamond received no stock options during the lives of NFFI and NFFII.

**88.** Diamond Deposition at 687, Appendix 1, Defendant's Motion for Summary Judgment on Compensation Discrimination and Managing Director Claims. Diamond's statement, in addition to other statements discussed *infra*, refutes her claim that she was forced to accept a carried interest as an emblem of discrimination.

**89.** Appendix 6, Defendant's Motion for Summary Judgment on Compensation Discrimination and Managing Director Claims.

**90.** *Id.*

**91.** *Id.* (emphasis added).

**92.** Under her 1985 compensation package, Diamond received a $100,000 base salary, a 12.5% share ("carried interest") in T. Rowe Price's in-

vestment in the partnership, and incentive bonuses tied to NFFI's performance relative to the median fund in the Lipper Universe. The 1989 Agreement increased Diamond's compensation parameters by raising her base salary to $130,-000 and her carried interest to 13.5%. The 1989 Agreement also contained a similar incentive bonus tied to NFFII's performance relative to the median fund in the Lipper Universe. The 1985 base salary of $100,000 represents a $5000 raise from the base salary she proposed in her March 29, 1985 memorandum. *See* Appendix 6, Defendant's Motion for Summary Judgment on Compensation Discrimination and Managing Director Claims.

**93.** The interpretation of ambiguous contractual language is left to the jury as the finder of fact. When contractual language is unambiguous, however, interpretation of the contact is a matter of law for the court. *See Truck Ins. Exchange v. Marks Rentals, Inc.,* 288 Md. 428, 418 A.2d 1187 (1980).

Price] except as specifically in the Agreement." [94]

During negotiations on the 1989 Agreement, Diamond requested a revision of the annual bonus provision.[95] Diamond testified that her "hope" was that T. Rowe Price would award her stock options and "substantial" annual bonuses if she "did a really good job with the fund, if [she] hit a home run, hit the cover off the ball, however you want to say it, beat the indices." [96]

The 1989 Agreement states that T. Rowe Price "shall, from time to time, consider awarding [Diamond] cash bonus[es], stock bonus[es] and other benefits involving the stock of Price Associates, *provided, however, that this sentence shall not obligate Price Associates to make any such awards, except*

as specifically provided in the Agreement." [97] Although not obligated to do so, T. Rowe Price opted to award Diamond annual bonuses of $25,000 in both 1989 [98] and 1990, but she received no annual bonus in 1991.[99] She received no stock options during any of the years covered by the 1985 and 1989 Agreements.[100]

Diamond cannot base her unequal wage claims on the failure to receive compensation that she had no right to receive.[101] Any expectation to the contrary is simply unreasonable and contradicts the express language of the Agreements.[102]

That Diamond did not receive stock options or greater annual bonuses shows only that T. Rowe Price exercised its contractual right not to award them. Having removed

**94.** Appendix A, Defendant's Motion for Summary Judgment on Plaintiff's Compensation Discrimination and Managing Director Claims (emphasis added). Nevertheless, the firm granted Diamond annual bonuses of $20,000, $20,000, and $25,000 in 1987, 1988, and 1989, respectively. Diamond Affidavit ¶ 9, Exhibit 2, Plaintiff's Opposition to Summary Judgment on Compensation Discrimination and Managing Director Claims. Diamond characterized these bonuses as "embarrassingly small." Diamond Deposition at 682, Appendix 1, Defendant's Motion for Summary Judgment on Compensation Discrimination and Managing Director Claims.

**95.** Diamond Deposition at 854–55, 860–61, 867, 870, 878, 880, and 882, Exhibit 1, Plaintiff's Opposition to Summary Judgment on Compensation Discrimination and Managing Director Claims.

**96.** Diamond Deposition at 854, Appendix 1, Defendant's Motion for Summary Judgment on Compensation Discrimination and Managing Director Claims.

**97.** Appendix 11 at 2, Defendant's Motion for Summary Judgment on Compensation Discrimination and Managing Director Claims (emphasis added).

**98.** There was only one bonus in 1989 of $25,000, but the Court need not decide whether that bonus was awarded under the 1985 or the 1989 Agreement.

**99.** Riepe Affidavit ¶ 12, Appendix 2, Defendant's Motion for Summary Judgment on Compensation Discrimination and Managing Director Claims.

**100.** *Id.* ¶¶ 10, 12.

**101.** To the extent that Diamond challenges the terms of the 1985 Agreement, her claim fails. Diamond contends that she was forced to enter into the 1985 Agreement, and its concomitant objective performance-based criteria, as a means of escaping a subjective compensation system that had discriminated against her. This argument has no support in evidence, as discussed *supra,* because she proposed the framework of the Agreement. Additionally, any claim that she was unfairly treated under the pre–1985 compensation system is time-barred. Further, any claim as to the terms of the 1985 Agreement itself falls outside the Title VII statute of limitations. The Agreement was executed on May 20, 1985, but Diamond filed her EEOC charge on March 24, 1992—more than 300 days after the signing dates of the 1985 Agreement.

Diamond also does not allege that the Agreements are vitiated by fraud or duress. Nor could she. As discussed, the 1985 Agreement was negotiated through counsel. After contract negotiations, Diamond's counsel wrote to T. Rowe Price's General Counsel that Diamond was "pleased with the document." Appendix 7, Defendant's Motion for Summary Judgment on Compensation Discrimination and Managing Director Claims. Diamond felt sufficiently comfortable with the framework of the 1985 Agreement to negotiate the changes she sought in 1989 on her own.

**102.** The annual bonuses and stock options form an integral part of the standard compensation scheme at T. Rowe Price. While the firm might not award them in a bad year, they would be expected in a good year. Indeed, Diamond received both regularly before 1985. The clear import of the 1985 and 1989 Agreements is that annual bonuses and stock options were not part of her compensation package.

herself from the standard compensation scheme by proposing that she receive "little or no annual bonus,"[103] Diamond cannot now complain that the inherent risk in her performance-based agreements constituted unequal pay.[104]

Additionally, Diamond's expectation of large annual bonuses and stock option awards is unrealistic. Under both the 1985 and 1989 Agreements, Diamond's compensation was "back-end loaded."[105] Likewise, T. Rowe Price also expected to receive the bulk of its income upon the termination of each fund.[106] In this respect, NFFI and NFFII differed from T. Rowe Price's mutual funds and private accounts. With regard to the latter, the firm is paid an annual fee based primarily on the amount of assets under management. Thus, the company knows, year to year, the performance of the portfolio or fund and the income derived therefrom. Fees gained in any given year cannot be wiped out by losses in later years.

Not so, however, with Diamond's funds. T. Rowe Price's profits in NFFI existed only on paper until the fund was liquidated in 1989. NFFII's substantial gains in 1989 and 1990 were entirely obliterated in 1991, and the fund was liquidated at a loss.

To bestow interim annual bonuses on Diamond before fund liquidation, T. Rowe Price would have been forced to guess as to the ultimate success of the fund. As the history of NFFII demonstrates, such an estimate would have been speculative at best and might have resulted in unjustified bonuses awarded to Diamond. The firm might expect her to remit any overpayments. Diamond never suggests that she would have been under such an obligation, however.[107]

Diamond also alleges that 11 male money managers at T. Rowe Price received more compensation than she did for substantially equal work.[108] Diamond's allegation is irrelevant because it does not defeat the affirmative defenses which demonstrate that any differential between her salary and her comparators' salary is attributable to non-discriminatory factors.[109] Nevertheless, the

**103.** Appendix 6, Defendant's Motion for Summary Judgment on Compensation Discrimination and Managing Director Claims.

**104.** In return for her unique and potentially lucrative performance-based employment contracts, Diamond simply "bargained away" any entitlement to annual bonuses and stock options. No reasonable juror could conclude otherwise.

Such an agreement might be discriminatory if, for example, several employees worked on commission but male employees earned a higher rate of commission than female employees for the same transaction. Such is not the case here. Diamond's compensation agreements were unique within T. Rowe Price.

Notwithstanding this caveat, however, the presence of a objective bonus/incentive payment scheme in a compensation agreement constitutes strong evidence that any pay differential is based on a factor other than sex. *See Bullock v. Pizza Hut, Inc.,* 429 F.Supp. 424, 430–31 (M.D.La. 1977); *Schutz v. Western Publishing Co.,* 609 F.Supp. 888, 897, 906 (D.C.Ill.1985); *Brownlee v. Gay & Taylor, Inc.,* 642 F.Supp. 347, 357, 362 (D.Kan.1986), *aff'd,* 861 F.2d 1222 (10th Cir. 1988).

**105.** That is, if the fund was successful, the bulk of Diamond's compensation (carried interest and incentive bonus) would be earned in the year of fund liquidation.

**106.** Although T. Rowe Price did earn from NFFI and NFFII some income in the form of annual

fees, the firm expected to receive most of its income in the year of liquidation. *See* Private Placement Memoranda for NFFI & NFFII, Appendices 2 & 3, Defendant's Motion for Summary Judgment on Constructive Discharge Claim.

**107.** Astute legal counsel representing both T. Rowe Price and Diamond negotiated the framework of the Agreements. If Diamond legitimately expected to be awarded annual bonuses and stock options based on unrealized gains, any mechanism for satisfying this expectation would be detailed in the contracts. The lack of such a mechanism indicates that neither T. Rowe Price nor Diamond could have had any reasonable expectation of interim bonus payments.

Additionally, Diamond testified on deposition that she "hoped" to be awarded stock options and "substantial" annual bonuses if she "hit a home run" with NFFI or NFFII. Diamond did not hit a home run with NFFII, which, by her own admission, performed poorly in 1991 and 1992.

**108.** *See infra* note 165.

**109.** As discussed *supra,* in an equal pay claim, a plaintiff must establish a prima facie case by demonstrating a wage differential between her pay and the pay of males doing equal work. The burden then shifts to the employer to show that the differential is attributable to affirmative de-

Court will address the merits of her contention.

Diamond's claims fails because she actually received more compensation than her alleged comparators. In 1989, Diamond received—in addition to an annual base salary of $130,000—an incentive bonus of $555,446, a carried interest payment of $439,386, and a $25,000 annual bonus. Annualized over NFFI's five-year life from 1985 to 1989,[110] Diamond's compensation averaged approximately $324,966.[111] The average compensation of Diamond's comparators for the same period, according to information supplied by Diamond's statistical expert James Johnston, was slightly less ($324,356).[112]

Even if calculated over different periods of time, Diamond's compensation still exceeded that of her comparators. From 1986 to 1991, the compensation of Diamond's alleged comparators was $316,746, whereas Diamond's

compensation was $366,768.[113] From 1989 to 1991, their average compensation was $357,019, and Diamond's was $542,386.[114] That Diamond's compensation, from 1990 to 1991, averaged less than the compensation of her comparators is attributable entirely to the poor performance of NFFII during those years.

Moreover, because the mechanisms for determining the compensation of Diamond and her comparators are substantially dissimilar, the 11 males are not Diamond's true comparators.[115] Under Diamond's Agreements, fund performance—not the subjective evaluations of the Compensation Committee—determined the size of Diamond's incentive bonus and carried interest payments. No other T. Rowe Price employee, male or female, had a similar performance-based compensation agreement.[116]

fenses. In this case, the Court has refrained from deciding whether Diamond has established a prima facie case because the affirmative defenses apply as a matter of law.

110. Because the funds were back-end loaded, Diamond's compensation must be viewed on an annualized basis over the life of each fund.

111. The Court calculated this figure by adding the incentive bonus and carried interest payments and dividing the total by five. The Court then added to this figure an average of Diamond's annual salary during this period ($106,000) and her typical year-end bonus under that Agreement ($20,000). The figure is a conservative estimate and does not include imputed income.

112. The Court calculated this figure using information from the compensation tables supplied by James Johnston and which were sent to the Court separately from plaintiff's opposition to summary judgment. Specifically, the Court relies on the table labelled "Total Compensation," which lists the total cash compensation, value of gift stock, and option exercise value received by Diamond's comparators. For each comparator, the Court determined the average total cash compensation for the period 1985 through 1989. Then the Court determined the average of these figures. In making this calculation, the Court excluded the compensation of the three members of the Board of Directors of T. Rowe Price. Diamond has made no proffer than any members of the Board of Directors performed work even roughly approximating her duties under the funds. Thus, Diamond cannot legitimately compare herself to any member of the Board of Directors.

113. Appendix 5, Defendant's Reply to Plaintiff's Opposition to Summary Judgment on Compensation Discrimination and Managing Director Claims.

114. *Id.*

115. T. Rowe Price's willingness to enter into such a unique employment agreement might reasonably be construed as evidence of an absence of the very discrimination about which Diamond complains.

Additionally, unlike Diamond, the 11 comparators managed funds and portfolios which generated fees to T. Rowe Price on an annual basis. Their monetary contributions could be calculated annually based on fees received. Diamond's contributions could not be measured annually because the funds she managed were designed to generate the bulk of their income upon liquidation.

116. After extensive discovery, Diamond could locate only two other compensation agreements bearing any similarity to Diamond's employment contracts. The two letter agreements outline a bonus calculation for Hubert Stiles and Richard Swingle, two successive managers of the T. Rowe Price Recovery Fund. Diamond argues that these two letter agreements are similar to her 1985 and 1989 Agreements. Plaintiff's Opposition to Summary Judgment on Compensation Discrimination and Managing Director Claims at 65; *id.* at Exhibits 28, 29. The letter agreements, however, do not resemble Diamond's Agreements in scope or intent.

Diamond's Agreements were comprehensive employment contracts that expressly removed

Diamond contends that the mere existence of a wage agreement does not preclude her claim of compensation discrimination. She relies primarily on *Dean v. United Food Stores, Inc.*, 767 F.Supp. 236 (D.N.M.1991). *Dean*, however, is inapposite.

In *Dean*, the defendant employer, a franchisor of convenience stores, had a policy of exclusively hiring husband and wife management teams. Although the husbands and wives of each team were considered "co-managers," wives received minimum wage while husbands were paid on a commission basis. Each team signed written agreements that set out pay and duties.

The plaintiff, Mrs. Dean, and her husband were hired to supervise a store in New Mexico. Both Mr. Dean and his wife performed the same tasks and had the same responsibilities, but their compensation was unequal. Under the standard contract, Mr. Dean received a commission based on the store's sales, but Mrs. Dean was paid $300 every two weeks. Over the course of two years' employment, the pay differential amounted to $47,000. Finding that Mr. and Mrs. Dean performed "substantially equivalent work," *id.* at 241, the court concluded that the store had violated the EPA and ruled in favor of the plaintiff.

*Dean* stands for the proposition that the mere existence of a wage agreement cannot be considered a "factor other than sex" if the contract embodies pay differentials which would themselves violate the Equal Pay Act or Title VII. *Anderson v. University of N. Iowa*, 779 F.2d 441, 444 (8th Cir.1985). While the Court endorses this legal proposition, *Dean* is inapposite here. Diamond's unique, negotiated, performance-based agreements simply cannot be compared to the contract at issue in *Dean*.[117]

In sum, Diamond's 1985 and 1989 Agreements constituted performance-based compensation systems that tied Diamond's pay to the objective performance of NFFI and NFFII. If, as was the case with NFFI, the portfolio earned money, so did Diamond. If, as was the case with NFFII, the portfolio lost money, Diamond was entitled to receive nothing more than her annual base salary of $130,000.[118] Thus, Diamond's Agreements qualify as compensation systems based on quality/quantity of production and also on factors other than sex.[119] No reasonable jury could conclude otherwise. Accordingly, T. Rowe Price's motion for summary judgment on Diamond's compensation discrimination claim under the Equal Pay Act and Title VII shall be granted by separate order.

---

her from the standard scheme at T. Rowe Price. They detail not only her annual salary, incentive bonus, and carried interest but also her job responsibilities and benefits. The Stiles and Swingle agreements, on the other hand, did not affect Stiles' and Swingle's presence in the standard compensation scheme and provided only an additional bonus calculation.

The carried interest and incentive bonus provisions in Diamond's Agreements constituted the bulk of her income. The bonus in the Stiles/Swingle agreements, however, merely provided an additional incentive for the managers of a chronically moribund fund. Thus, the Stiles/Swingle bonus served as an inducement for resuscitating a fund with a history of poor performance. T. Rowe Price represented during a hearing—and Diamond did not controvert—that neither Stiles nor Swingle has received any money under their agreements.

Additionally, Diamond cannot name Stiles or Swingle as legitimate comparators. The T. Rowe Price Recovery Fund required the fund manager, and other T. Rowe Price personnel, to involve themselves actively in the management of companies in bankruptcy or on the verge of bank-

ruptcy. This job is dissimilar to Diamond's duties under NFFI and NFFII, which primarily consisted of making decisions about trading stock. The Court finds that the Stiles/Swingle agreements are substantially dissimilar to Diamond's 1985 and 1989 Agreements.

117. Diamond successfully negotiated Agreements that tied her compensation to the performance of her funds, but in *Dean* the plaintiff-wife signed a standard contract that the employer offered to all wives in the management teams. *Dean* also did not involve the affirmative defense of quality/quantity of production.

118. The 1985 and 1989 Agreements protected Diamond from the prospect of a sustained bear market. She would be entitled to an incentive bonus in the year of liquidation provided that her fund's portfolio declined less than the median fund in the Lipper Universe. Diamond received her annual base salary regardless of fund performance.

119. *See supra* note 101.

## C. Constructive Discharge

Diamond was not fired. She left work on March 24, 1992 and refused to return.[120] Thus, her claim falls in the category of constructive, as opposed to actual, discharge.

In deciding whether an employee must actually be fired in order to bring a suit for discriminatory discharge, the courts have struck a balance among the policies behind Title VII, the concerns of the employer, and the interests of the employee. On the one hand, an employee should not be expected to endure intolerable work conditions. On the other hand, an employer should be protected from discharge suits when the employee leaves of her own accord.

An employee may assert a constructive discharge claim only by demonstrating that the employer deliberately made work conditions so intolerable that no reasonable person would have remained on the job. This rule serves the strong legislative policy in favor of the employee's remaining on the job while her claim is being investigated by the EEOC or litigated in the courts.[121] As one court has stated, the standard remedy under Title VII is "to stay and fight." *Halbrook v. Reichhold Chemicals, Inc.*, 735 F.Supp. 121, 127 (S.D.N.Y.1990).

To promote this goal of mediating discrimination claims within the context of continued employment, federal law strictly prohibits any form of retaliation against an employee who has filed a discrimination claim. Thus, an employee is not permitted to leave work simply because she alleges discrimination in the workplace.[122]

As a matter of law, a constructive discharge occurs when "an employer deliberately makes an employee's working conditions intolerable and thereby forces him to quit his job." *Bristow v. Daily Press, Inc.*, 770 F.2d 1251, 1255 (1985) (citations omitted), *cert. denied*, 475 U.S. 1082, 106 S.Ct. 1461, 89 L.Ed.2d 718 (1986). *Accord Johnson v. Shalala*, 991 F.2d 126, 131 (4th Cir.1993), *petition for cert. filed*, 62 U.S.L.W. 3149 (U.S. Aug. 16, 1993) (No. 93–248); *EEOC v. Clay Printing Co.*, 955 F.2d 936, 944 (4th Cir. 1992). The Fourth Circuit has cautioned that constructive discharge claims must be "carefully cabined" by district court judges because "the claim of constructive discharge is so open to abuse by those who leave employment of their own accord." *Paroline v. Unisys Corp.*, 879 F.2d 100, 114 (4th Cir. 1989) (Wilkinson, J., concurring in part and dissenting in part), *adopted en banc*, 900 F.2d 27, 28 (4th Cir.1990).

A plaintiff alleging constructive discharge must prove two elements: (1) deliberateness of the employer's actions and (2) intolerability of the working conditions.[123]

---

**120.** *See* April 1, 1992 letter from Andrew C. Goresh to Diamond informing her that she was still considered an employee. Appendix 18, Defendant's Motion for Summary Judgment on Constructive Discharge Claim. Goresh also wrote that unless Diamond replied by April 6, 1994, T. Rowe Price would consider her to have abandoned her job effective March 31, 1994. Diamond *did not reply* and asserts that the letter was a sham because Goresh wrote it after T. Rowe Price had received Diamond's EEOC charge.

 The Goresh letter cannot be dismissed so lightly, however. Had Diamond reported for work, Title VII would have protected her against retaliation. Also, T. Rowe Price would have had an opportunity to demonstrate (by continuing to employ Diamond) that it had not (and did not wish to) discharge her. By refusing to return, Diamond leaves T. Rowe Price in the position of having to prove a negative—namely, that the firm never discharged Diamond in the first place.

**121.** "[T]he policies underlying Title VII will be best served if, whenever possible, unlawful discrimination is attacked within the context of existing employment relations." *Cowan v. Prudential Ins. Co.*, 703 F.Supp. 177, 192 (D.Conn.1986) (citations omitted).

**122.** Similarly, unless other facts are present that make conditions intolerable, even actual discrimination does not render a workplace intolerable.

**123.** Title VII is an anti-discrimination statute. Thus, an employee faced with intolerable work conditions has no remedy unless those conditions were the product of discrimination. "To establish constructive discharge under Title VII, the employee must have been subjected to *employment practices which are discriminatory* and which make the working conditions intolerable, thus forcing the employee to quit. Further, the employer's actions must be intended by the employer as an effort to force the employee to quit." *EEOC v. Federal Reserve Bank*, 698 F.2d 633, 672 (4th Cir.1983) (citations omitted) (emphasis added), *rev'd on other grounds*, 467 U.S. 867, 104 S.Ct. 2794, 81 L.Ed.2d 718 (1984).

*Bristow,* 770 F.2d at 1255; *Johnson v. Shalala,* 991 F.2d at 131. The first element, deliberateness, "can be demonstrated by actual evidence of intent by the employer to drive the employee from the job, or circumstantial evidence of such intent, including a series of actions that single out a plaintiff for differential treatment." *Johnson v. Shalala,* 991 F.2d at 131. The second element, intolerability, "is assessed by the objective standard of whether a 'reasonable person' in the employee's position would have felt compelled to resign." *Bristow,* 770 F.2d at 1255.

In deciding the instant motion, the Court focuses primarily on the intolerability prong of the two-part test and concludes that Diamond has not proffered sufficient evidence that her work conditions were intolerable. Because Diamond has failed to make such a showing, she has not created an issue of material fact that would preclude summary judgment.[124]

The case law, from this circuit and others, defining intolerable work conditions is instructive. The hallmark of such cases is egregious personal harassment, especially sexual or racial in nature:

(1) Employer falsely accused plaintiff of stealing from company, told her that she would be replaced by a male, and asserted that she did not "fit the mold" because she was a woman. *Levendos v. Stern Entertainment, Inc.,* 860 F.2d 1227 (3d Cir. 1988);

(2) Company knew plaintiff was being racially harassed but did nothing. *Holsey v. Armour & Co.,* 743 F.2d 199, 209 (4th Cir.1984), *cert. denied,* 470 U.S. 1028 [105 S.Ct. 1395, 84 L.Ed.2d 784] (1985).

(3) Employer incessantly asked plaintiff when he would resign, demanded that he train his young successor, required him to explain his demotion to the company's biggest client, and asked him to introduce the young successor to that client. *Stephens v. C.I.T. Group/Equipment Fin. Co.,* 955 F.2d 1023 (5th Cir.1992);

(4) Supervisor referred to women as "broads," purposely created a false record to denigrate the plaintiff, and eliminated all of her job duties. *Scott v. Oce Indus., Inc.,* 536 F.Supp. 141 (N.D.Ill.1982);

(5) Supervisor verbally abused plaintiff in front of other employees, told her she had no future with the company, and ordered her to do illegal things. *Thomas v. Cooper Indus., Inc.,* 627 F.Supp. 655 (W.D.N.C. 1986).

Diamond admits that no one at T. Rowe Price was hostile, personally abusive, or even discourteous to her. She also admits that no one ever asked her to resign or even mentioned resignation. To the contrary, two senior executives at T. Rowe Price, Roche and Riepe, encouraged her to remain at the company despite the poor performance of NFFII.[125]

Diamond does not allege any overt instance of sexual harassment, anti-Semitism,[126] or misogyny by anyone at T. Rowe Price. Indeed, the individuals she accuses of discrimination are the same persons who worked with her amicably for over a decade.[127]

In Diamond's view, her principal antagonist was Mathias. Yet he gave her unfettered discretion to manage the affairs of NFFI and NFFII and interpolated himself only when the poor performance of the second fund became apparent. Indeed, in both newspaper articles and letters to prospective clients, Mathias praised Diamond as "an absolutely gifted investor."[128]

---

124. As discussed *infra,* the Court alternatively believes that no fair-minded jury would conclude that the actions of T. Rowe Price were deliberately calculated to force Diamond to resign.

125. *See supra* note 74.

126. Diamond does not allege that anyone at T. Rowe Price made anti-Semitic remarks, exhibited anti-Semitic behavior, or even mentioned her religion during her employment.

127. Diamond does not allege that her inter-personal or professional relationships with her co-workers changed during the course of her career at T. Rowe Price.

128. Mathias stated in a profile of Diamond appearing in *The Baltimore Sun* that she

is an absolutely gifted investor. Her record over the years shows that. Her intuitions on the market are remarkable.... She is very independent. She accepts nothing on face val-

Additionally, in 1991 and 1992, T. Rowe Price was enjoying a period of prosperity and expansion. · Diamond has proffered no evidence of "downsizing" at the firm that would motivate T. Rowe Price to engineer her departure.[129]

Diamond correctly observes that T. Rowe Price did not inform her what her post-NFFII assignment would be. After a conversation with Riepe, in which he stated his hope that she would "stay on in some capacity," Diamond expressed in her diary a doubt that a mutually satisfactory position could be negotiated.[130] Yet Diamond never sought to negotiate for a new project or pursue a new assignment; she left work before NFFII was liquidated.

Nevertheless, Diamond maintains that T. Rowe Price intended to force her to resign.[131]

She cites a series of incidents taken by T. Rowe Price with respect to NFFII which, when viewed as a whole, allegedly made her working conditions intolerable.[132]

The Court reviews these incidents in light of a recent Fourth Circuit decision: *Paroline v. Unisys Corp.*, 879 F.2d 100 (4th Cir.1989), *affirmed in part and reversed in part en banc,* 900 F.2d 27 (4th Cir.1990). *Paroline* stands for the proposition that summary judgment may be granted in a constructive discharge case even though the employer's intent is at issue. *Paroline* also teaches that in order to raise a question of material fact, intent to discharge must be fairly inferable from the challenged incidents. The incidents must also have rendered the job objectively intolerable to a reasonable person.[133]

ue. She has a very questioning and tough mind. She understands the dynamics of the investment world and makes exceptional investment decisions.
Brian Sullivan, "Diamond's Advice Is Good as Gold," *The Baltimore Sun,* July 4, 1988, Exhibit 3 attached to Diamond Affidavit, Exhibit 2, Plaintiff's Opposition to Summary Judgment on Compensation Discrimination and Managing Director Claims; *see also* letter from Mathias to George Hambrecht dated August 13, 1990, *id.* at Exhibit 12 (stating that Diamond is "a truly gifted investor").

**129.** In both of the cases Diamond cites in support of her claim for constructive discharge, *Scott v. Oce Indus., Inc.,* 536 F.Supp. 141 (N.D.Ill.1982), and *Thomas v. Cooper Indus., Inc.,* 627 F.Supp. 655 (W.D.N.C.1986), deteriorating economic conditions in part motivated the employers to force the plaintiffs to resign.

**130.** Exhibit 9 at Bates Stamp 0002, Plaintiff's Opposition to Summary Judgment on Constructive Discharge Claim.

**131.** Diamond concedes that T. Rowe Price was genuinely concerned about the fund's troubles. Diamond contends, nevertheless, that the firm discriminated against her because it would not have engineered the liquidation of NFFII had the fund been managed by a Gentile male. During discovery, the Court considered it important to allow Diamond wide latitude to substantiate her claim by identifying a comparable situation. Accordingly, the Court allowed Diamond broad discovery into all of T. Rowe Price's investment vehicles that might be considered comparable to NFFI or NFFII within the relevant time period. Despite this, she was unable to identify any relevant situation. At best, Diamond showed that in some years some male portfolio managers under-

performed the market but did not lose their jobs. This proves nothing.

**132.** In her brief on constructive discharge, Diamond cites the same group of incidents as establishing both deliberateness and intolerability. T. Rowe Price allegedly:

(1) placed restrictions on plaintiff's ability to trade and denied her requests for initial public offerings;
(2) required plaintiff to sign and abide by an agreement forbidding her from communicating with her clients;
(3) secretly contacted and then met with NFFII investors in Europe in an attempt to switch the investors to a fund managed by a male;
(4) transferred plaintiff's research assistant to another department without consulting plaintiff;
(5) amended NFFII's partnership documents to change the redemption provisions;
(6) refused to answer plaintiff's questions about her status with NFFII and therefore treated plaintiff differently from other male fund managers who had performed poorly;
(7) informed plaintiff that $75,000 had been erroneously distributed to her in 1989–90 and would have to be re-paid; and
(8) failed to deny plaintiff's statement that she had been constructively discharged.

Plaintiff's Opposition to Summary Judgment on Constructive Discharge Claim at 36–37, 47–49.

**133.** *Paroline* appears to focus strictly on the employer's deliberateness rather than on the intolerability of working conditions. Judge Wilkinson's dissent, which was adopted by the Fourth Circuit *en banc,* does not discuss whether a reasonable employee would have found working conditions at Unisys intolerable after the company's efforts to punish Moore and accommodate Paroline.

In that case, the plaintiff, Elizabeth Paroline, complained to her employer Unisys Corporation that a male co-worker, Edgar Moore, was sexually harassing her. Moore made sexually suggestive remarks to Paroline at work and rubbed his hands on her back. When a severe snowstorm hit the area and the office closed early, Paroline had no way home and reluctantly accepted a ride from Moore.

During the trip, Moore kissed Paroline and tried to hold her hand, all against her wishes. Upon arriving at Paroline's apartment, he insisted on coming inside. Once in Paroline's apartment, Moore began kissing her and rubbing his hands on her back. Although Moore initially refused to stop, Paroline finally persuaded him to leave.

The next morning, Paroline reported the incident to her supervisor, and Unisys launched a formal investigation. As the investigation revealed, other female employees at Unisys had previously complained of Moore's unwelcome verbal and physical advances.

The company disciplined Moore. Unisys formally warned him that he would be terminated if such an incident occurred again. Moore was required to seek psychiatric counselling. His planned promotion and salary increase were delayed. Moore was directed to limit his contact with female employees to official business. A written memorandum setting forth the conditions of his continued employment was placed in his personnel file.

Further, following Paroline's recommendation, Unisys withdrew Moore's access to a high security area where Paroline was to work after she obtained her own security clearance. This action temporarily increased Paroline's contact with Moore, but there was no evidence of any further incidents.[134]

Paroline considered these measures inadequate, fearing, based on Moore's history, that he would harass her again. Knowing that Paroline was dissatisfied, the company offered her two weeks of vacation, urged her not to quit, and offered to pay for counselling. Paroline resigned anyway and filed a Title VII suit alleging sexual harassment and constructive discharge.

The trial court granted summary judgment for Unisys on the constructive discharge claim, but, in a 2–1 decision, a panel of the Fourth Circuit reversed the lower court's ruling. According to the majority, a reasonable fact finder could conclude that Unisys' method of disciplining Moore was in actuality the ploy of a "clever or sophisticated employer" calculated to force Paroline to resign. *Id.* at 114. Under this theory, Unisys might have intended to make Paroline's work conditions intolerable by increasing the risk of contact between her and Moore at a point when Paroline wished to avoid Moore altogether.

Judge Wilkinson dissented, stating that if "a claim this thin is one for the trier of fact, it is hard to imagine any claim of constructive discharge on which summary judgment would be appropriate." *Id.* at 115. He concluded that "the company's actions here reflect the opposite [of an intent to force the plaintiff to resign]; Unisys actively took action to improve Paroline's conditions of employment." *Id.* In a subsequent rehearing en banc, the Fourth Circuit reversed and adopted Judge Wilkinson's reasoning. 900 F.2d 27, 28.

One may assign an improper motive from almost any employment decision that an employee finds unacceptable. Under *Paroline,* however, a claim may survive summary judgment only if intent to discharge is fairly inferable from the challenged incidents and if working conditions are objectively intolerable.[135]

---

Although the panel opinion concludes that Paroline proffered sufficient evidence of intolerability, Judge Wilkinson does not expressly address that subject. The Fourth Circuit's en banc adoption of Judge Wilkinson's dissent would seem to nullify the panel's earlier finding as to intolerability.

**134.** Unisys could not assign Paroline to the high security area until the Department of Defense had issued her a security clearance. There was no reason to believe that Paroline would be denied clearance, but it was unclear how long the process would take. 879 F.2d at 109 n. 1.

**135.** Intolerability and deliberateness are conceptually related. As the oppressiveness of working conditions increases, one may more readily draw an inference of discriminatory intent.

The actions challenged by Diamond do not satisfy either requirement. Each was a facially reasonable business response to the problems of NFFII's poor performance in 1991. The courts, which exist to redress discrimination, have no jurisdiction to resolve differences of opinion over the wisdom of management decisions. *EEOC v. Clay Printing Co.*, 955 F.2d 936, 946 (4th Cir.1992) ("It is not for this court or any other governmental agency to direct the business practices of any company. . . . It is not the purpose of the EEOC nor the function of this court to second guess the wisdom of business decisions."). The Court shall now address the challenged actions seriatim.

### 1. *Restricting Increases in NFFII's Net Short Position*

In early January 1992, Mathias ordered Diamond not to increase the net short position of NFFII's portfolio. No inference of discrimination can legitimately be drawn from his decision. Diamond's extensive shorting of the fund's portfolio had resulted in heavy losses in 1991, while other "small cap" funds were enjoying a banner year. The extensive shorting had generated complaints from NFFII's investors and was contrary to the investment objectives stated in the fund's governing documents.[136] Despite Mathias' order, Diamond retained control over NFFII's portfolio and could buy and sell stock as she wished [137] so long as the net short position of the fund's portfolio was not increased.[138]

### 2. *Ordering Diamond Not to Send Draft Letter*

In early January 1992, in response to Mathias's order not to increase NFFII's net short position, Diamond circulated the draft of a letter she proposed sending to the fund's investors.[139] In the sixth paragraph of the draft letter, Diamond wrote that, "[a]t this point, the Fund's portfolio is no longer being actively managed by me." [140] She stated that "portfolio management decisions are no longer mine." [141] Thus, she concluded, "the performance of 1992 will not reflect a portfolio as I would structure it at this point." [142] Upon receipt of the draft letter, Collins, the CEO of T. Rowe Price, immediately sent to Diamond a memorandum directing her not to

---

**136.** As discussed *supra*, although NFFII's operative documents permitted short selling, the clear objective of NFFII was long-term investment in the common stock of small, thinly-traded companies.

**137.** Diamond claims that she was required to clear all new trades through Mathias. T. Rowe Price denies this and asserts that the firm only told Diamond not to increase the net short position. Mathias Affidavit ¶ 15, Appendix 11, Defendant's Motion for Summary Judgment on Constructive Discharge Claim.

The facts support the view of T. Rowe Price. Diamond never identified a single trade that she was required to clear through Mathias. Diamond's trader, Alan Stewart, stated in his affidavit that he executed all of Diamond's trading requests. Stuart Affidavit, Appendix 20, Defendant's Motion for Summary Judgment on Constructive Discharge Claim. Stewart produced his handwritten notes reflecting these trades. The notes show that Diamond also took new short positions. Appendices 3 & 4, Defendant's Reply to Plaintiff's Opposition to Summary Judgment on Constructive Discharge Claim. Indeed, Diamond testified on deposition that she could not remember whether or not she shorted stock after Mathias ordered her not to increase the fund's net short position. *Id.* at Diamond Deposition at 1305, Appendix 2. Diamond produced insufficient evidence that any of her trading requests were denied. *Id.* at 947–48, 951.

**138.** Diamond also asserts that T. Rowe Price denied her requests for stock from initial public offerings ("IPOs") during 1992. *See* Diamond Deposition at 949, Exhibit 1, Plaintiff's Opposition to Summary Judgment on Constructive Discharge Claim. Other than her own conclusory deposition testimony, however, Diamond proffers no evidence that her requests for IPOs were denied. *Id.* at 950. Diamond never identified any IPO stock that she wanted but that was denied her. A party's unsupported assertions are insufficient to overcome summary judgment when that party bears the burden of proof on an issue. Thus, the Court concludes that Diamond has failed to create a genuine issue of material fact regarding any alleged denial of IPOs.

**139.** Appendix 1, Diamond Deposition Exhibit 67, Defendant's Motion for Summary Judgment on Constructive Discharge Claim.

**140.** *Id.*

**141.** *Id.*

**142.** *Id.*

mail the draft and ordering her not to contact her clients without prior approval.[143]

As Diamond concedes, Collins was concerned that the draft letter might increase public relations problems with NFFII's investors. Mathias also believed that, coupled with NFFII's poor performance in 1991 and 1992, Diamond's letter was unprofessional and might engender, at the least, unnecessary friction between T. Rowe Price and investors.

Collins' order was a reasonable response to Diamond's draft letter, which aired a professional dispute between Diamond and her employer over NFFII's investment strategy. Approximately ten days later, Diamond's letter, minus the three offending sentences, was sent to investors.[144]

### 3. Contacting NFFII Investors

Faced with NFFII poor performance and potential client relations problems, the firm's Management Committee decided to contact many of NFFII's limited partners to ascertain the level of investor dissatisfaction. The Committee determined that Brooks Carey, a T. Rowe Price Vice President familiar with the European investment community, should initiate the contacts by telephone. Subsequently, Mathias and Carey travelled to Europe to meet with some of the investors personally. Diamond complains that she should have been included on the trip. The Court cannot conclude, however, that the firm's decision to exclude Diamond, who was responsible for the fund's performance, from these meetings represents an unreasonable judgment.[145]

### 4. Transferring Randi Kitt

As previously discussed *supra* note 68, Diamond claims that the transfer of her research assistant, Randi Kitt, to another department at T. Rowe Price was part of the conspiracy to force Diamond to resign. The evidence, however, flatly contradicts this claim. In the fall of 1991, several months before the NFFII problems became apparent to the firm, Kitt became dissatisfied with Diamond's short selling strategy. Kitt stated that the rapid turnover of stock in the NFFII portfolio frustrated her attempts to develop knowledge and expertise about "small cap" growth companies. She, therefore, began looking for a job outside T. Rowe Price. Only after another firm expressed an interest in hiring her did she eventually explore a transfer within T. Rowe Price. Kitt continued to assist with the liquidation of NFFII into April 1992, after Diamond had left work. Thus, contrary to Diamond's view, Kitt herself initiated the transfer, and the conspiracy claim fails.

### 5. Allowing Investors to Vote on NFFII Liquidation

Diamond complains that T. Rowe Price encouraged the European investors to withdraw from NFFII. The record demonstrates that, faced with investor dissatisfaction and requests for redemption that could not be honored, T. Rowe Price offered investors the opportunity to decide for themselves whether to continue with NFFII or to withdraw.[146] Diamond has proffered no credible evidence that T. Rowe Price encouraged investors, all of whom were sophisticated institutional money managers, to vote in favor of liquidation. The investors were fully capable

---

**143.** Collins Memorandum, Appendix 1 at Diamond Deposition Exhibit 68, Defendant's Motion for Summary Judgment on Constructive Discharge Claim.

**144.** *See* Appendix 12, Defendant's Motion for Summary Judgment on Constructive Discharge Claim.
 Diamond adhered to Collins' directive that she not communicate with NFFII investors without prior approval. This presented some difficulties for Diamond because there were occasional delays in securing approval. As a result, some written communications were delayed, and Diamond was unable to return some phone calls in a

timely fashion. Nevertheless, she was eventually able to respond to her clients. Diamond Deposition at 962–63, 965, Appendix 2, Defendant's Reply to Plaintiff's Opposition to Summary Judgment on Constructive Discharge Claim.

**145.** It was reasonable to believe that investors would be more forthcoming without Diamond present.

**146.** Merely allowing investors a chance to vote on these issues did not necessarily mean liquidation of the fund.

of exercising independent judgment, and they decided almost unanimously to withdraw from the fund.

### 6. *Isolating Diamond*

Diamond alleges that T. Rowe Price refused to keep her informed about the status of NFFII and therefore isolated her. She asserts that T. Rowe Price interposed Mathias between her and her clients, thereby depriving her of information about the fund. Diamond also complains that she was not asked to handle the amendment of the NFFII redemption provisions. T. Rowe Price's decisions, however, do not suggest that the firm sought to force her to resign or make her work conditions intolerable.

First, Diamond has exaggerated the extent of her alleged isolation. By her own admission, she had a number of meetings with top T. Rowe Price management, including members of the Management Committee.[147]

Second, given NFFII's troubles, it was reasonable for the firm to assign Mathias, the official head of NFFII, to deal with these problems.[148] There is also no evidence that Mathias' contacts with NFFII clients evince a plan to force Diamond to resign. Mathias' program to evaluate investor dissatisfaction and to offer investors a vote was reasonable and did not make Diamond's conditions of employment intolerable,[149] especially when she had already received encouragement to stay at the firm.[150]

### 7. *Informing Diamond of Erroneous NFFII Distributions*

In February 1992, Joseph P. Croteau, Director of Financial Reporting for T. Rowe Price, informed Diamond that $75,085 had been erroneously distributed to her in connection with NFFII and that repayment would be made through deductions from future cash distributions.[151] Diamond alleges that hostility toward her motivated the firm's request for repayment of the erroneous distributions. Diamond produces no evidence, however, that Croteau was part of a plot to

---

**147.** Diamond presents no evidence that T. Rowe Price met more frequently with male fund managers having investment or management problems. In early 1992, Diamond admits that she had the following meetings with top officers of the management team at T. Rowe Price:

Jan. 9: Mathias, Roche;
Jan. 10: Mathias, Roche, Riepe;
Jan. 14: Hopkins;
Feb. 10: Carey;
Feb. 16: Carey;
Feb. 18: Mathias, Carey;
Feb. 19: Mathias;
Feb. 28: Riepe;
Mar. 2: Mathias;
Mar. 9: Mathias, Robins;
Mar. 24: Mathias, Robins.

Plaintiff's Opposition to Summary Judgment on Constructive Discharge Claim at 18–30, 47–49. After the incident involving Diamond's draft letter, the Management Committee did not deal directly with Diamond but communicated through Mathias, who, as the fund's head, was the logical liaison between the Management Committee and Diamond, and also between Diamond and the NFFII investors.

T. Rowe Price's witnesses testified to many more meetings than those listed above. Diamond also received memos from Collins and Mathias. *Id.* The Court concludes that Diamond has not raised any genuine issue of fact as to her alleged isolation.

In essence, Diamond complains that T. Rowe Price did not answer all of Diamond's questions in a manner acceptable to her. Even accepting this, Diamond's work conditions would not be objectively intolerable.

**148.** This is particularly so in light of the firm's justified reaction to paragraph six of Diamond's draft letter.

**149.** The Court makes no finding that T. Rowe Price handled this situation in the best possible fashion. Title VII only requires that companies not discriminate against employees based on their gender, race, or national origin. T. Rowe Price's handling of NFFII's problems, while perhaps not ideal, was a reasonable response to a legitimate and serious business problem.

**150.** *See supra* note 74.

**151.** In this paragraph the Court does not decide the merits of Count VI of the amended counterclaim—namely, whether the defendant or plaintiff prevails on the motion for summary judgment as to the $75,000 distribution. The Court's inquiry is more narrow here and focuses only on whether T. Rowe Price reasonably believed that the money had been erroneously distributed. Diamond raised no contemporaneous objection to the accuracy of the calculation and offered no evidence suggesting otherwise. *See also* Exhibits 4 and 5, Defendant's Motion for Summary Judgment on Count VI of the Amended Counterclaim.

force her resignation or that he invented the overpayment issue.[152]

Diamond does not claim she was entitled to the $75,085 sum.[153] Nor does she argue that T. Rowe Price's calculation of the figure was incorrect.[154] No reasonable employee would find it intolerable for an employer to demand the repayment of an erroneously distributed sum of money.

### 8. Referring Diamond to Andrew C. Goresh

Finally, Diamond contends that Mathias' and Robbins' failure to deny her statement that "this is constructive discharge" constitutes a tacit admission that she was indeed being discharged.[155] She draws the same conclusion from Robbins' statement that Diamond speak with Andrew C. Goresh, Director of Human Resources for T. Rowe Price. According to Diamond, to be referred to Goresh is tantamount to being fired.

This argument cannot withstand scrutiny. As explained *supra* in the statement in facts, Goresh did not have the authority to fire Diamond. Lucy Robbins' statement to speak with Goresh appears to have been nothing more than a startled response to an unexpected charge of discrimination. Mathias and Robbins had already asked Diamond if she wanted to assist in the liquidation of the partnership, a process requiring at least several weeks of work. Further, Diamond had received some assurances that she would not be fired from both Riepe and Roche, two senior managers who encouraged her to remain at the firm.[156] In this context, no fair-minded jury could conclude that the exchange between Diamond and Mathias/Rob-

bins constituted a tacit admission that Diamond was being constructively discharged.[157]

Neither of the cases Diamond cites as support for her constructive discharge claim— *Scott v. Oce Indus., Inc.*, 536 F.Supp. 141 (N.D.Ill.1982), and *Thomas v. Cooper Indus., Inc.*, 627 F.Supp. 655 (W.D.N.C.1986)—is analogous to the instant case. Indeed, both demonstrate how far short Diamond's constructive discharge claim falls.

In *Scott v. Oce Indus., Inc.*, Patricia Scott, who was a victim of sexual harassment and compensation discrimination, claimed that she was forced to resign from her job. Scott's problems began when she and her supervisor, Edward Regal, had a confrontation over a request for a salary increase. 536 F.Supp. at 144–45. The court found that Regal believed that women should not be as highly compensated as men because they often marry and have children. *Id.* at 145. The court also found that Regal had a narrow view of women and referred to them as "broads." *Id.* at 144 n. 2.

During the two months following the confrontation, Regal decreased Scott's job responsibilities, shunned and avoided her, and told her that she would no longer travel as part of her duties. *Id.* at 145. Scott then filed an EEOC charge but remained on the job. *Id.*

The company retaliated against Scott by placing in her personnel file a bogus memorandum denigrating her performance as an employee and falsely making her appear both incompetent and uncooperative. *Id.* at 146. A top company official told another employee to stop associating with Scott because she had filed an EEOC charge. *Id.* Finally,

---

**152.** Croteau did not tell Diamond that repayment must be made immediately. He wrote that the $75,085 amount would be treated as an interest-free loan to be repaid from future cash distributions to Diamond. Thus, the Croteau memorandum is inconsistent with a plan to force Diamond's immediate departure. By assuming that Diamond would remain affiliated with T. Rowe Price during the repayment period, the memorandum contradicts any intent to get rid of her immediately. Had the firm intended to apply maximum pressure to Diamond, it would have demanded that she repay the full sum immediately.

**153.** *See* Plaintiff/Counter–Defendant's Motion for Summary Judgment on Defendant/Counter–Plaintiff's Amended Counterclaim at 18.

**154.** *Id.*

**155.** *See supra* note 120.

**156.** *See supra* note 74.

**157.** In order to credit Diamond's assumption, a jury would be required to find that Robbins was a member of a conspiracy and had knowledge that one of the purposes of the conspiracy was to drive Diamond from the firm.

Regal told Scott, "I can't fire you, but I can certainly make it tough so you quit." *Id.*

Scott believed that a brief "cooling off" period was necessary and took a vacation, hoping that when she returned Regal's attitude would have changed. *Id.* It did not. Upon her return, however, Scott found that the company had removed all of her files and her "open item book," which contained the remainder of her job duties. *Id.* The court concluded that "[a]t that point her working conditions had become wholly intolerable." *Id.* Scott resigned shortly thereafter.

The facts of *Thomas v. Cooper Indus., Inc.*, 627 F.Supp. 655, also illustrate the egregious personal and sexual harassment that mark a viable constructive discharge claim. The plaintiff, Rebecca Thomas, served as the personnel supervisor in a manufacturing plant in North Carolina. Avoiding unionization was a central tenet of the company. When the position of employee relations manager became available, Thomas applied. A senior company official stated, however, that there was "no way" a woman could stand up to a union. *Id.* at 660. Another company official said that the company had not had "much success with female personnel managers in the South." *Id.* at 661.

The company ultimately gave the managerial position to a male whom the court found less qualified than Thomas.[158] Because the man who proposed Thomas for the promotion refused to "back off" from his recommendation, the company fired him. *Id.* at 661. After the company passed over Thomas for the promotion, her supervisor, Ed Sherbert, told her that she had no future with the company and that the plant was too small for an assistant employee relations manager, which was then her position. *Id.* at 665–66.

Another of Thomas' superiors, Bert Hackett, was personally abusive toward her. *Id.* at 663. Hackett interrupted an employee training class she was teaching and yelled, "Lady, if you send that report [which identi-

fied an irregularity], you'll get Houston on my back, and if you do, you're through." *Id.* Hackett shunned Thomas, refused to consider her request for a pay raise, avoided her in the halls, and shut his door in her face.

In an effort to increase the strain on Thomas, Hackett also imposed "make work" requirements, forcing her to interview prospective employees at a location miles away. Over Thomas' objections, Hackett directed Thomas not to hire a qualified and acceptable applicant who was paraplegic because, as he stated, "[w]e don't need that problem."[159] *Id.* at 663. After analyzing this employment situation, which caused Thomas to resign, the court concluded that she was not unduly sensitive but had been extraordinarily tough.

Diamond alleges no facts remotely approaching the level of personal and sexual harassment in *Scott* or *Thomas.* Diamond admits that no one at T. Rowe Price was hostile, abusive, or even discourteous to her. No one suggested that Diamond find another job or told her that a female could not handle the management of a $25 million limited partnership. Indeed, the firm had rewarded Diamond's noteworthy performance with NFFI by increasing her annual salary and carried interest for NFFII. Her supervisor, Edward Mathias, publicly praised Diamond as a gifted investor.[160] He allowed Diamond free reign to manage NFFII as she saw fit—until the fund's problems became apparent. T. Rowe Price did not create NFFII's problems; Diamond's investment strategy did. The firm reacted to these problems in a reasonable manner.

Diamond has shown neither an intent to force her to resign nor intolerability of working conditions. No reasonable jury could conclude otherwise. Accordingly, T. Rowe Price motion for summary judgment on Diamond's constructive discharge claim shall be granted by separate order.

---

**158.** At trial, the court found that the official was lying when he offered the implausible explanation that she was unqualified for the job. *Id.* at 665.

**159.** Thomas believed that not hiring the paraplegic would be illegal. Thomas's belief appears to be correct. *See* Rehabilitation Act of 1973, as amended, 29 U.S.C. ¶¶ 701–797(b).

**160.** *See supra* note 128.

**406**

D. *Failure to Be Promoted to Managing Director*

■ In order to establish a prima facie case of discriminatory failure to promote, Diamond must show that: (1) she is a member of a protected group; (2) she applied for the position in question; (3) she was qualified for the position; and (4) she was rejected for the position in favor of someone not a member of the protected group under circumstances giving rise to an inference of unlawful discrimination. *Alvarado v. Board of Trustees of Montgomery Community College*, 928 F.2d 118, 121 (4th Cir.1991). The burden to establish these elements is not onerous. *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 1093–94, 67 L.Ed.2d 207 (1981).

■ Once a prima facie case has been established, the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for failing to promote the plaintiff. *Id.* at 253, 256, 101 S.Ct. at 1093–94, 1095. If the employer does so, then the plaintiff bears the ultimate burden of proving that the articulated nondiscriminatory explanation is a pretext for discrimination.[161] *Id.*

■ Although Diamond, as a Jewish female, is a member of a protected group and she applied for the position of Managing Director,[162] she has not shown that she was qualified for the position or that she was rejected in circumstances giving rise to an inference of discrimination. The Court thus focuses on the third and fourth elements of Diamond's prima facie case.

One seeking to become promoted to Managing Director at T. Rowe Price must meet five criteria.[163] Diamond satisfies three of these: she was a Vice President of T. Rowe Price Associates; she had worked at T. Rowe Price for at least ten years; and she worked hard and had a good attitude. Diamond does not, however, meet the remaining two criteria: (1) substantial responsibilities when compared to other professional staff; and (2) sufficiently significant contributions in the past and the promise of the same in the future.

As part of her case, Diamond identified 11 male employees at T. Rowe Price (her "comparators") whom she alleges have been named Managing Directors although their responsibilities and contributions are comparable to her own.[164] Their promotion in preference to her, Diamond contends, demonstrates discrimination. The Court disagrees. While Diamond had considerable responsibilities at T. Rowe Price, she simply lacked the level of fund and personnel management of the 11 Managing Director comparators.[165]

**161.** Rebuttal may be "either directly by persuading the [fact finder] that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Id.*

**162.** One does not "apply," in the formal sense, to be a Managing Director of T. Rowe Price. Periodically, the Management Committee reviews potential candidates—sometimes without their knowledge. The evidence shows that Diamond's name came up in this context at least once. Further, Diamond testified that she wanted to be promoted to Managing Director and that she expressed this desire to members of the Management Committee. Thus, the Court considers Diamond to have satisfied the "application" element of her failure to promote case.

**163.** Exhibit C, Defendant's Motion for Summary Judgment on Compensation Discrimination and Managing Director Claims at 1.

**164.** Letter (dated August 20, 1993) from Diamond's Counsel to the Court; Riepe Affidavit ¶ 14(f), Exhibit 2, Defendant's Motion for Summary Judgment on Compensation Discrimination and Managing Director Claims.

**165.** The list of Diamond's comparators has fluctuated throughout the lengthy discovery period in this case. In a letter to the Court dated August 20, 1993, Diamond's attorney stated that the 11 comparators were: Preston Athey, Richard Swingle, Jack Laporte, Charles Smith, Charles Salisbury, Peter Van Dyke, Brian Rogers, William Reynolds, David Testa, Edward Mathias, and George Roche. In her opposition to summary judgment, however, Diamond listed a total of 21 comparators. Diamond is bound by the earlier list of 14 names because it served as the basis for T. Rowe Price's discovery into and analysis of Diamond's promotion claim. The Court has ruled that Diamond's attempt, in her opposition to T. Rowe Price's motion for summary judgment, to enlarge the earlier list is untimely and prejudicial.

Nevertheless, the expanded list would not help Diamond prove her promotion claim because none of the additional individuals has been named a Managing Director (Preston Athey, Hu-

Five of the names on Diamond's list may be summarily disregarded. Preston Athey has never been named a Managing Director.[166] Four others are members of the Board of Directors of T. Rowe Price (David Testa, George Roche, Charles Salisbury, and Edward Mathias). This latter group shares responsibility for running a public corporation with over 1700 employees, thousands of clients, and over $46 billion in assets under management. In addition, each of these four individuals personally manages funds valued in excess of several hundred million dollars. Diamond cannot reasonably compare herself to these persons.

Diamond's own analysis focuses on the responsibilities and contributions of the remaining six individuals. They are:[167]

**John Laporte,** who manages the New America Growth Fund ($500 million in assets), the New Horizons Fund ($1.5 billion in assets), the Science & Technology Fund ($300 million in assets), and private accounts worth more than $200 million.

**Richard Swingle,** who manages the High Yield Fund ($1.7 billion in assets) and private accounts worth more than $48 million.

**Charles Smith,** who manages the New Income Fund ($1 billion in assets), the U.S. Treasury Intermediate Fund ($150 million in assets), and private accounts worth more than $1.4 billion.

**Peter Van Dyke,** who manages the U.S. Treasury Long Term Fund ($60 million in assets), the Spectrum Growth Fund and the Spectrum Income Fund ($500 million in assets), the GNMA Fund ($950 million in assets), and private accounts worth more than $3 billion.

**William Reynolds,** who manages the Tax–Free High Yield Fund ($950 million in assets), Tax–Free Income Fund ($1 billion in assets), Tax–Exempt Money Fund ($1 billion in assets), New York and New Jersey Tax–Free Bond Funds, Tax–Free Short Intermediate Fund, and private accounts worth more than $100 million. Reynolds also directs the Tax–Free Bond Division and is thus responsible for 15 mutual funds.

**Brian Rogers,** who manages the Equity Income Fund ($2.7 billion in assets), the T. Rowe Price Growth Stock Fund ($1 billion in assets), the T. Rowe Price Dividend Growth Fund, and private accounts worth more than $300 million.

Diamond, on the other hand, managed one portfolio valued at $25 million. One secretary and one research assistant reported to her. The Court concludes that Diamond's contributions to T. Rowe Price, while noteworthy, did not satisfy the third and fourth criteria for promotion to Managing Director—namely, sufficient responsibilities and contributions.[168]

bert Stiles, Stephen Boesel, Roger McNamee, John Powell, Douglas Hickman, Richard Howard, Terrel Jordan, Charles Morris, and David Warnock). *See* Riepe Affidavit ¶ 31, Appendix 2, Defendant's Motion for Summary on Compensation Discrimination and Managing Director Claims; Supplemental Riepe Affidavit, Appendix 3, Defendant's Reply to Plaintiff's Opposition to Summary Judgment on Compensation Discrimination and Managing Director Claims.

166. Riepe Affidavit ¶ 31, Appendix 2, Defendant's Motion for Summary Judgment on Compensation Discrimination and Managing Director Claims.

167. All of the statistics about the alleged comparators are taken from the affidavit of James S. Riepe, Appendix 2, Defendant's Motion for Summary Judgment on Compensation Discrimination and Managing Director Claims.

168. There is no set number of Managing Directors at T. Rowe Price, and the firm may elevate an employee to the position at any time. Thus, Diamond is not required to show that there was a "job vacancy" within the 300–day limitations period. Moreover, both parties agree that Brian Rogers was named as a Managing Director in September 1991, within the limitations period.

Even if failure to promote is viewed as a "continuing violation," however, the 300–day limitations period is relevant to Diamond's claims. A Title VII plaintiff is required to file a claim with the EEOC within 300 days of the alleged discriminatory event. Even if the discriminatory acts are considered "continuing violations," a plaintiff must nevertheless show that a violation occurred during the 300–day period. *Hill v. AT & T Technologies,* 731 F.2d 175, 180 (4th Cir.1984); *Jensvold v. Shalala,* 829 F.Supp. 131, 135 (D.Md. 1993).

In this case, Diamond alleges that she should have been made a Managing Director from 1987 onward. In order to proceed with her claim, she must proffer evidence that she warranted the promotion during the 300–day period. At this

Moreover, at least one male with an investment record more impressive than Diamond's has also not been promoted. As T. Rowe Price has shown, Preston Athey grew the Small–Cap Value Fund from $45 million in 1991 to over $400 million in 1993. The advisory fees associated with the fund exceeded $1 million in 1992 alone. Athey also manages several other funds, portfolios, and private accounts.[169] That Athey was also passed over lends weight to T. Rowe Price's assertion that Diamond was unqualified to be a Managing Director.

In addition to her analysis of comparators, Diamond relies primarily on the affidavit of her statistical expert, David Evans, who asserts that the likelihood of T. Rowe Price (1) having employed only three female portfolio managers out of a total of 26 is 2.4% and (2) having no female Managing Directors is 0.6%.[170] Evans' analysis assumes that 30.3% of graduates from certain prestigious business schools are female.[171]

■ In the Fourth Circuit, however, statistical evidence alone is insufficient to raise an inference of discriminatory intent in a disparate treatment case.[172] Further, Evans' statistics by themselves prove little. The 30.3% figure might be useful when analyzing the percentage of female portfolio managers in investment firms nationwide, but the figure is not helpful in this specific case. Evans makes no attempt to determine what percentage of female graduates pursue employment with Baltimore investment firms in general or with T. Rowe Price in particular.[173]

The Court concludes that Diamond has failed to proffer sufficient evidence that she was qualified for the position of Managing Director. Accordingly, the Court shall, by separate order, grant T. Rowe Price's motion for summary judgment on the failure to promote claim.

### E. Amended Counterclaim

### 1. Counts I–V

T. Rowe Price alleges that Diamond improperly removed over 100 files from the

---

time, however, Diamond's objective performance was poor. NFFII steadily declined in value and complaints from investors mounted. Further, Diamond has pointed to no instance in which an individual has been made a Managing Director during a period of troubled performance.

Diamond also argues that if her duties are not comparable to the 11 named males, this is attributable to her being "held back" throughout her career. This contention suffers from several legal and factual defects. She has not identified any assignment (e.g., manager of a private account or a mutual fund) that was denied her during the 300–day period that might have advanced her career. Thus, as a matter of law, her claim of being "held back" is barred by limitations. As a factual matter, there is no evidence (beyond Diamond's conclusory assertions) that she sought additional or different job responsibilities after the formation of her funds. Given the success of NFFI, the time to have done so would have been in 1989. The record does not disclose that Diamond made any effort to change her job duties. Instead, with T. Rowe Price's encouragement and assistance, Diamond formed NFFII.

**169.** Riepe Affidavit ¶ 31, Appendix 2, Defendant's Motion for Summary Judgment on Compensation Discrimination and Managing Director Claims.

**170.** Evans Affidavit ¶ 4, Exhibit 4, Plaintiff's Opposition to Summary Judgment on Compensation Discrimination and Managing Director Claims.

**171.** *Id.* The Court does not dispute this figure.

**172.** The Fourth Circuit has cautioned against such use of statistics. *Warren v. Halstead Indus., Inc.,* 802 F.2d 746, 753 (4th Cir.1986) (stating that "statistics cannot alone prove the existence of a pattern or practice of discrimination, or even establish a prima facie case shifting to the employer the burden of rebutting the inference raised by the figures"), *aff'd en banc,* 835 F.2d 535 (4th Cir.), *cert. denied,* 487 U.S. 1218, 108 S.Ct. 2872, 101 L.Ed.2d 907 (1988); *see also Taylor v. Secretary of Army,* 583 F.Supp. 1503, 1509 (D.Md.1984) (asserting that "a plaintiff may not avoid his burden of proving each of the separate elements of a prima facie case by relying merely on statistical evidence which purportedly establishes a pattern-and-practice of racial discrimination"). *But see Lewis v. A.T. & T Technologies, Inc.,* 691 F.Supp. 915, 920 (D.Md.1988) (Murray, J.) (stating that statistical evidence may be used to raise an inference of discrimination when a Title VII plaintiff alleges disparate treatment).

**173.** Even if Diamond could establish a prima facie case of failure to promote, she has not proffered sufficient evidence rebutting the explanation provided by T. Rowe Price—namely, that she was not objectively qualified to be a Managing Director.

firm. T. Rowe Price began its efforts to secure the return of the files in March 1992. When Diamond refused informal requests, the firm sought (through the counterclaim) to obtain the documents by legal means. Eventually, Diamond surrendered the files in March 1993. Having secured them, T. Rowe Price's claim fails.

Although Diamond may have removed some of the files shortly before her departure, the vast majority had been maintained in her home office, with the full knowledge and approval of T. Rowe Price, over the course of years. The files contained many of the working documents (more than 10,000 pages) that Diamond used to manage NFFI and NFFII. They included research on companies (generated both by Diamond and by others), correspondence with clients, and other papers that one would expect a busy fund manager to collect over the years. Most of the documents are outdated or within the public domain (e.g., annual reports, SEC filings such as Form 10–Ks).

As the nominal "owner" of the documents, T. Rowe Price was entitled to their return. The firm has made no showing, however, that Diamond ever misused the files or the information therein, that the firm suffered any damage from their temporary absence, or that any of the files contained trade secrets.[174]

In essence, the first five counts of the counterclaim allege that Diamond improperly removed and withheld the documents. These counts advance state law claims for Breach of Fiduciary Duty (Count I), Replevin (Count II), Conversion (Count III), Trespass (Count IV), and violations of the Maryland Uniform Trade Secrets Act (Count V). The Court concludes, however, that T. Rowe Price has failed to establish a prima facie case on any of these counts, and the Court will grant summary judgment in favor of Diamond.

As to Breach of Fiduciary Duty (Count I), the claim fails because T. Rowe Price has not shown that Diamond's possession of the documents breached a duty to her employer.[175] Diamond testified without contradiction that, like many T. Rowe Price portfolio managers, she frequently worked at an office in her home on nights and on weekends.[176]

Diamond also worked from her house office during normal business hours. With the aid of a computer, modem, and telephone, investment counselling is well-suited for "telecommuting."[177] Diamond testified that on occasion she spent as much as 70% of her working hours at home.[178] T. Rowe Price

174. In alleging that Diamond removed files and trade secrets improperly, T. Rowe Price relies exclusively on the bare and conclusory assertions of Lucy Robbins, staff lawyer for T. Rowe Price, in opposing Diamond's motion for summary judgment as to the counterclaims. *See* Affidavit of Lucy Robbins, Appendix 1 ¶¶ 3–5, T. Rowe Price's Opposition to Summary Judgment on Counterclaim. Robbins' affidavit lack sufficient specificity, however, to overcome Diamond's denials.

175. In a recent case, the Maryland Court of Appeals expressly declined to state the prima facie elements for breach of fiduciary duty. *Adams v. Coates,* 331 Md. 1, 11–12, 626 A.2d 36 (1993). Nevertheless, the *Adams* court cited with approval the definition for "Violation of Fiduciary Duty" from the Restatement (Second) of Torts § 874: "[o]ne standing in a fiduciary relation with another is subject to liability to the other for harm resulting from a breach of duty imposed by the relation." Thus, it can be assumed that the elements of breach of fiduciary duty include: (1) the presence of fiduciary relationship between the parties; (2) a duty, created in the fiduciary by this relationship, to act on

behalf of the other party; (3) a breach of this duty by the fiduciary; and (4) damage to the other party caused by the breach.

T. Rowe Price asserts that its monetary damages consist of the cost of photocopying the 10,000 documents in Diamond's possession. At the Court's direction, Diamond allowed T. Rowe Price access to all of the documents months before she returned them. The firm could have copied only those papers that it truly needed for its business or which were truly confidential. T. Rowe Price, however, elected to photocopy all 10,000 pages, including SEC filings and other chaff. The firm can hardly claim the cost of its indiscriminate photocopying as damages in this suit.

176. Exhibit 1 at 2186–88, Plaintiff/Counter–Defendant's Motion for Summary Judgment on Amended Counterclaim.

177. *Id.* at 2079.

178. *Id.* During her two maternity leaves, Diamond worked at home 100% of the time. *Id.*

approved of her doing so, installed a computer in her house, and even messengered documents to her.[179] No fair-minded jury could conclude that Diamond's possession of the documents in her home office was wrongful or a breach of Diamond's fiduciary duty.

T. Rowe Price contends that, in anticipation of litigation, Diamond removed a large number of files from the firm's headquarters shortly before she left work on March 24, 1992. Diamond denies this allegation. The firm has failed to make a sufficient factual showing that Diamond "looted" T. Rowe Price's files.

All of the documents in Diamond's possession were within the scope of her legitimate business duties. Through her last day, Diamond remained a T. Rowe Price employee entitled to have documents at home. There is no evidence that she did not continue working on NFFII matters until the end. Accordingly, the Court shall, by separate order, grant Diamond's motion for summary judgment as to the breach of fiduciary duty count.

 As for Replevin (Count II), the cause of action "is designed to obtain possession of personal property that is wrongfully detained by" another person. *Ganter v. Kapiloff,* 69 Md.App. 97, 100, 516 A.2d 611 (Md.Ct.Spec.App.1986) (citations omitted), *cert. denied,* 309 Md. 48, 522 A.2d 392 (1987). The remedy available is an order requiring the defendant to return the property.[180] The plaintiff cannot recover monetary damages

unless deprivation of the property caused a loss. *See Koch v. Mack Int'l Motor Truck Corp.,* 201 Md. 562, 95 A.2d 105 (1953).

T. Rowe Price first demanded return of the files on October 14, 1992[181] but did not file an action for replevin until February 5, 1993. Diamond returned all documents on March 4, 1993.[182] The papers were not harmed, and T. Rowe Price has not suffered any loss from their temporary detention.[183] Thus, the firm has been made whole, and no reasonable jury could find otherwise. The Court will grant Diamond's motion for summary judgment as to the replevin count.

 As for Conversion (Count III), Diamond lawfully possessed the documents as an employee of T. Rowe Price. No claim for *actual* conversion is therefore possible.[184] The firm contends, however, that Diamond *constructively* converted the documents by refusing for five months to return them when requested to do so by their rightful owner.[185]

 Under Maryland law, mere temporary interference, absent damage to the rightful owner, is insufficient to establish conversion. *Yost v. Early,* 87 Md.App. 364, 388, 589 A.2d 1291 (Md.Ct.Spec.App.), *cert. denied,* 324 Md. 123, 596 A.2d 628 (1991). The five-month gap between T. Rowe Price's demand for the disputed documents and Diamond's return of the same may have caused T. Rowe Price some inconvenience. Such inconvenience, however, cannot be redressed through an action for conversion. Thus, Dia-

179. According to a feature story on Diamond in *The Baltimore Sun,* "[T. Rowe] Price Associates installed a computer in her house and each day delivered to her house the reports and other materials she needed." *See supra* note 128.

180. Under Maryland law, an action for replevin is not actionable until the person not in possession asserts an adversary right. *Cline v. Fountain Rock Lime & Brick Co.,* 217 Md. 425, 143 A.2d 496, 499 (1958).

181. Appendix 4, Defendant's Opposition to Summary Judgment on Counterclaim.

182. *Id.* at 2058; *see also* Appendix 6, Defendant's Opposition to Summary Judgment on Counterclaim.

183. The firm has not demonstrated that its business operations were hampered in any respect by

Diamond's possession of the files. Moreover, T. Rowe Price was given access to the files and, indeed, copied them before the originals were returned.

184. To establish conversion, a party must show "the exercise of unauthorized dominion and control to the complete exclusion of the rightful possessor." *Yost v. Early,* 87 Md.App. 364, 388, 589 A.2d 1291 (Md.Ct.Spec.App.), *cert. denied,* 324 Md. 123, 596 A.2d 628 (1991).

185. *See id.* ("In order to establish a constructive conversion, ... it is necessary to show a demand for the return of the chattel [personal property] by the rightful owner, and a refusal by the wrongful holder, or some assertion of an adversary right by the holder." (citations omitted)).

mond is entitled to summary judgment as to Count III.

■ As for Trespass (Count IV),[186] the Court, having already determined that the conversion count fails, must now consider whether T. Rowe has alleged evidence sufficient to meet the less strict interference standard required for trespass. *Staub v. Staub*, 37 Md.App. 141, 143–44, 376 A.2d 1129 (Md.Ct.Spec.App.1977). T. Rowe Price's claim for trespass fails for two reasons.

■ First, the courts of Maryland have decided that "the measure of damages for trespass to a chattel is the diminished value of the chattel which results from the damages actually sustained from the time of the taking until the return of the goods." *Id.* at 145, 376 A.2d 1129. T. Rowe Price has proffered no evidence that the documents themselves lost value in the five months between the demand for and the return of the documents.

■ Second, under Maryland law, a court must consider six factors to determine the seriousness of the interference. *Id.* at 144, 376 A.2d 1129 (citing the Restatement (Second) of Torts, § 222A(2) (1965)). These six factors are: (1) the extent and duration of the actor's exercise of dominion or control; (2) the actor's intent to assert a right in fact inconsistent with the other's right of control; (3) the actor's good faith; (4) the extent and duration of the resulting interference with the other's right of control; (5) the harm

done to the chattel; and (6) the inconvenience and expense caused to the other. *Id.*

These factors weigh against T. Rowe Price. The documents suffered no harm. T. Rowe Price's business operations were not hampered by their temporary detention. Diamond had a plausible, although ultimately incorrect, belief that many of the documents belonged to her as gifts or as personal correspondence.[187] Diamond's possession was not exclusive, for T. Rowe Price had full access to the files. Thus, as a matter of law, any interference was not actionable, and the Court shall, by separate order, grant Diamond's motion for summary judgment as to the trespass count.

■ Finally, as to Count V, T. Rowe Price contends that by refusing to relinquish the files, Diamond misappropriated trade secrets, thereby violating the Maryland Uniform Trade Secrets Act ("MUTSA"). Md. Com.Law II Code Ann. §§ 11–1201 to –1209 (1990). The MUTSA count raises two inquiries: (1) whether the documents qualify as trade secrets; and (2) whether Diamond misappropriated them.

■ As to the first inquiry, to qualify as a trade secret under MUTSA,[188] the information must "(1) hold independent economic value because it is not generally known to or readily ascertainable by others who stand to benefit economically if they use or disclose it, and (2) be the subject of reasonable efforts to maintain its secrecy." *Optic Graphics v. Agee*, 87 Md.App. 770, 787, 591 A.2d 578 (Md.Ct.Spec.App.) (citations omitted), *cert.*

---

**186.** Diamond correctly observes that, "[w]here there has been a single interference with a chattel, the owner may recover for trespass or for conversion, *but not for both*." *Staub v. Staub*, 37 Md.App. 141, 145, 376 A.2d 1129 (Md.Ct. Spec.App.1977) (emphasis added).

**187.** Exhibit 1 at 2067–71, Plaintiff's/Counter–Defendant's Motion for Summary Judgment on Counterclaim.

**188.** Under MUTSA, there are two types of trade secrets: technological developments and internal operating information. *Optic Graphics v. Agee*, 87 Md.App. 770, 784, 591 A.2d 578 (Md.Ct. Spec.App.), *cert. denied*, 324 Md. 658, 598 A.2d 465 (1991). Internal operating information, also

known as "internal business facts," relates to a particular business organization. *Id.* (citations omitted).

In *Optic Graphics*, the Maryland Court of Special Appeals affirmed a lower court's ruling that a company's pricing information and marketing strategy were not trade secrets within the meaning of MUTSA. *Id.* at 787–88, 591 A.2d 578. The appeals court noted that, in some circumstances, such information may be protectable as trade secrets. *Id.* at 787, 591 A.2d 578. The court concluded, however, that the challenged documents included too many variables, were too specific to the company involved, and were too subject to change to have independent economic value. *Id.* Thus, they were not trade secrets. *Id.*

*denied,* 324 Md. 658, 598 A.2d 465 (1991).[189]

T. Rowe Price alleges that the files possessed and maintained by Diamond qualify as trade secrets because the information contained in them constituted "confidential investment research, confidential client lists, and attorney-client privileged communications."[190] The Court disagrees.

As discussed *supra,* Diamond's files contained papers that she had accumulated during the course of her seven-year management of NFFI and NFFII. Almost all of the documents were either outdated (e.g., interoffice memoranda), innocuous (e.g., routine correspondence), or publicly available (e.g., SEC filings such Form K–1s).

■ Indeed, T. Rowe Price pointed to only a handful of the 10,000 documents as containing trade secrets. The firm has made no showing that even these documents qualify as such, however.[191] For example, two of the documents describe the tax withholding status and investment structure of NFFI. Another document is an analyst's cursory evaluation of a sneaker company. Another series of documents relates to general business matters (e.g., NFFII redemption requests, phone conversations concerning the distribution of NFFI assets). While these documents may have some utility to T. Rowe Price, there is no evidence that they have any independent economic value for anyone else. Diamond testified—and T. Rowe Price

did not gainsay—that much of this information could be obtained simply by writing to various companies.[192]

Even if the documents were trade secrets, there was no actionable "misappropriation" in this case. In order to qualify as misappropriation under MUTSA, one must either acquire the trade secret by improper means or disclose the trade secret without express or implied consent. Md.Com.Law II Code Ann. § 11–1201(c)(1)–(2) (1990). T. Rowe Price has proffered no evidence that Diamond improperly acquired the files or disclosed their contents to others. Thus, the MUTSA count fails as a matter of law.[193] Accordingly, the Court shall, by separate order, grant Diamond's motion for summary judgment as to Count V of the Amended Counterclaim.

### 2. *Count VI*

In Count VI, T. Rowe Price alleges Failure to Pay Debt. According to T. Rowe Price, Diamond owes the firm $110,085 as the total amount due on two loans or advances made to Diamond during her employment with T. Rowe Price. The first loan allowed Diamond to purchase, under the terms of her 1989 Compensation Agreement, a limited partnership interest in NFFII for $35,000. The promissory note memorializing that interest-free loan is dated April 5, 1989.[194] An additional $75,085 represents an advance T. Rowe Price allegedly made to Diamond so that she

189. MUTSA itself defines a trade secret as: "Information, including a formula, pattern, compilation, program, device, method, technique, or process, that:

(1) derives independent economic value, actual or potential from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and

(2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy."

Md.Com.Law II Code Ann. § 11–1201(e) (1990); *Optic Graphics,* 87 Md.App. at 783–84, 591 A.2d 578; *Trandes Corp. v. Guy F. Atkinson Co.,* 996 F.2d 655, 661 (4th Cir.), *cert. denied,* — U.S. ——, 114 S.Ct. 443, 126 L.Ed.2d 377 (1993).

190. Defendant's Opposition to Summary Judgment on Counterclaim at 5.

191. That several documents are emblazoned with the words "ATTORNEY–CLIENT PRIVILEGE"

does not show that they contain trade secrets. This warning proves nothing. Moreover, that a document is confidential does not automatically make it a trade secret. *See Trandes,* 996 F.2d at 661–62.

192. Exhibit 1 at 2070–71, Plaintiff/Counter–Defendant's Motion for Summary Judgment on Counterclaim. Further, most of the information about the structure and tax status of NFFI and NFFII was distributed widely to potential investors during the effort to sell limited partnerships. Additionally, by 1992, information concerning NFFI was seven years old.

193. T. Rowe Price allowed her to work at home, regularly sent documents to her home, and cannot now complain that her possession of these documents violates MUTSA.

194. Appendix 7 at Exhibit 2, Defendant's Opposition to Summary Judgment on Counterclaim.

could re-pay amounts distributed to her in error by the NFFII partnership. In deciding the instant summary judgment motions, the Court considers each loan separately.

Diamond signed the $35,000 promissory note on April 5, 1989.[195] Diamond admits that she borrowed the money, purchased the interest, and signed the promissory note.[196] Diamond contends, however, that the statute of limitations for enforcing the note has expired.[197] This argument assumes that the promissory note is a demand note. Under Maryland law, an action to recover on a demand note begins to run on the date of execution and expires three years later. *Jenkins v. Karlton*, 329 Md. 510, 516–17, 620 A.2d 894 (1993).

T. Rowe Price counters by asserting that the limitations period did not begin to run until May 1, 1992, the day the firm demanded repayment.[198] The resolution of this issue depends on whether the promissory note is a true demand note.

The proper characterization of the promissory note is a matter of state law. Maryland courts examine several factors in deciding whether a note qualifies as a demand note. A demand note:

is one "in which no time for repayment is stated." *Waller v. Maryland Nat'l Bank*, 95 Md.App. 197, 212, 620 A.2d 381 (Md.Ct. Spec.App.), *judgment vacated*, 332 Md. 375, 631 A.2d 447 (1993);

"expressly states that it is payable on demand, on presentation or at sight." *Waller*, 95 Md.App. at 212, 620 A.2d 381 (citing *Black's Law Dictionary* at 224 (5th ed. 1983)); and

is "payable immediately, without demand." *Jenkins v. Karlton*, 329 Md. 510, 517, 620 A.2d 894 (1993) (citations omitted).

Unless an action on a demand note is brought within three years of its date or delivery, it is barred. *Id.* "This is so because the statute begins to run when the payment becomes due, *i.e.*, on the date the note is executed." *Id.* (citations omitted).

The promissory note in this case provides that Diamond will repay the $35,000 loan "on demand *but only after [Diamond] has been given thirty (30) days notice thereof.*"[199] T. Rowe Price was obligated to provide Diamond with 30 days' notice before making a demand upon her. Such notice was a condition precedent to any repayment demand. Thus, T. Rowe Price could not have filed suit to enforce the note until the firm (1) had given the requisite notice and (2) the 30-day period expired without repayment.[200] After

195. *Id.*

196. Diamond Deposition at 1758, Appendix 9, Defendant's Opposition to Summary Judgment on Counterclaim.

197. T. Rowe Price filed the instant counterclaim on May 6, 1992.

198. T. Rowe Price also asserts that Diamond did not execute the note on April 5, 1989. This argument is without merit. Diamond testified that she signed the 1989 Compensation Agreement in June, 1989, but she neither stated nor suggested that she signed the note on any day other than April 5, 1989, the date appearing on the face of the note.

199. Appendix 7 at Exhibit 2, Defendant's Opposition to Plaintiff's Motion for Summary Judgment on Counterclaims (emphasis added).

200. Additionally, the note provides for the possibility of "prepayment." If the note were a true demand note, prepayment would be a logical impossibility.

Under *Blick v. Cockins*, 131 Md. 625, 630, 102 A. 1022 (1917), a demand note is *not* payable immediately upon delivery when a different intention is apparent from the terms of the instrument or from the purposes and circumstances of the transaction. In the instant case, the express terms of the promissory note state that it would be due only after a demand for repayment. Appendix 7, Defendant's Opposition to Summary Judgment on Counterclaim. Because the parties' statements and the terms of the note show that the note was intended to be payable only *after* demand, the Court finds that the phrase "on demand" in the disputed note does not make it a demand note.

Moreover, the purpose of the note was to enable Diamond to purchase her carried interest in NFFII. The note was interest free and, therefore, not an investment on T. Rowe Price's part. The parties' operative assumption was that Diamond would repay the demand note after the carried interest had been distributed to her upon termination of NFFII. Although T. Rowe Price had a technical right to demand repayment at any time during the life of NFFII, it was never T. Rowe Price's intention to exercise that right before the fund's liquidation.

review of this language, the Court concludes that the promissory note is not a demand note; therefore, the suit to recover the $35,000 loan is not time-barred.

■■■ Alternatively, the Court finds that Diamond acknowledged the $35,000 debt in her income tax returns every year from 1989 to 1992. These acknowledgments served to toll the statute of limitations on the promissory note and thereby removed any bar to recovery.[201]

The $35,000 promissory note expressly states that the loan shall be interest free. For income tax purposes, an employer making an interest free loan to an employee is deemed to have paid, as compensation to the employee, an amount equal to the annual interest the employee would have been required to pay had she borrowed the money from a commercial lender. This amount is known as "imputed income."

T. Rowe Price reported the imputed income on the Form 1099s that the firm provided to the Internal Revenue Service and to Diamond every year from 1989 to 1992. When Diamond first requested clarification of the Form 1099s, T. Rowe Price explained that the "forgiven" interest payment must be treated as income.[202] Consistent with this explanation, Diamond attached the 1099 Forms to her income tax returns for the years 1989–1992 and reported the imputed income as "nonemployee compensation." [203]

In some states, the filing of an income tax return that reports a debt does qualify as an acknowledgement.[204] Other states, however, have reached a contrary result.[205] Maryland courts appear not to have decided this specific issue.

■■■ Under Maryland law, an acknowledgment must be a "clear, distinct, unquali-

**201.** In *Potterton v. Ryland Group, Inc.*, 289 Md. 371, 375–76, 424 A.2d 761 (1981) (citations omitted), the Maryland Court of Appeals stated the rationale for the rule that an acknowledgement tolls the statute of limitations on a debt:

> The Act of Limitations does not operate to extinguish the debt, but to bar the remedy.... The Act of Limitations is predicated on the principle, that from length of time a presumption is created that the debt has been paid, and that the debtor is deprived of his proof by the death of his witnesses or the loss of receipts. It is the design of the Act of Limitations to protect and shield debtors in such a situation; and consistent with this principle and this view, ... the acknowledgement or admission of the debtor will take the case out of the Act of Limitations, because if the money is still due and owing, the defendant has not suffered from lapse of time, nor has any inconvenience resulted to him therefrom.

**202.** Appendix 7 at Exhibit 3, Defendant's Opposition to Summary Judgment on Counterclaim. Under the tax laws, a company that pays dividends and other miscellaneous income is required to report these amounts to the United States government on a Form 1099.

**203.** Appendices 10 & 11, Defendant's Opposition to Summary Judgment on Counterclaim. Although Diamond states that she did not acknowledge the debt, she neither mentions nor refutes the validity of the 1099 Forms or her tax returns.

**204.** In *Sebastian Enter., Inc. v. Florida First Nat'l Bank*, 345 So.2d 827, 828 (Fla.Dt.Ct.App.1977), an accountant for the appellant-corporation signed corporate tax returns and balance sheets that listed a disputed debt. The court ruled that the inclusion of the debt on the corporate documents was an acknowledgment sufficient to toll the statute of limitations. *See also Whale Harbor Spa, Inc. v. Wood*, 266 F.2d 953, 954 (5th Cir. 1959) (holding that, under Florida law, the inclusion of a debt on balance sheet constitutes an acknowledgment tolling the statute of limitations).

**205.** In *United States v. Jacobs*, 155 F.Supp. 182, 190–91 (D.N.J.1957), for example, the court ruled that, under New York law, the decedent's signature on a corporate income tax return was insufficient to acknowledge a debt and toll the statute of limitations. In *Jacobs*, however, the decedent had personally signed only a *single* corporate income tax return, which, in the court's view, was insufficient to recognize a series of debts incurred by the decedent over the course of several years. Thus, the purported acknowledgment did not meet the requirement under New York law that it be "consciously made in recognition of the *entire debt.*" *Id.* at 191 (emphasis added).

In *Rickenbach v. Noecker Shipbuilding Co.*, 66 N.J.Super. 580, 169 A.2d 730, 733 (1961), the Superior Court of New Jersey ruled that corporate tax returns do not constitute a writing sufficient to meet the requirements of the New Jersey statute governing acknowledgment of a debt. In *Rickenbach*, however, the court noted that, under New Jersey law, an acknowledgment must either be made to the creditor or intended to be communicated to him. *Id.* 169 A.2d at 732.

fied admission." [206] *Potterton v. Ryland Group, Inc.*, 289 Md. 371, 375, 424 A.2d 761 (1981) (citations omitted). An acknowledgment in Maryland, unlike in New Jersey (discussed *supra* note 205), need not be made to the creditor or with the intent that the acknowledgement be communicated to the creditor. Indeed, a statement to an unrelated third person has been held sufficient to acknowledge a debt and "take the case out of the operation of the statute of limitations." *Weil v. Lambert*, 183 Md. 233, 37 A.2d 312, 317 (1944) (citing *Gill v. Donovan*, 96 Md. 518, 54 A. 117 (1903) and *Stewart v. Garrett*, 65 Md. 392, 5 A. 324 (1886)).

The Court concludes that, under Maryland law, Diamond's reporting of imputed income on her tax returns is an acknowledgement sufficient to toll the statute of limitations. A tax return is a clear, distinct, and unqualified admission made in writing to the United States Government under penalty of perjury. Each time Diamond filed her income tax returns, the three-year statute of limitations was automatically tolled for another year. [207]

Diamond has not repaid the $35,000 loan, demand has been made, and the promissory note is now due. Accordingly, as to the $35,000 note in Count VI of the counterclaim, the Court shall, by separate order, grant T. Rowe Price's motion for summary judgment and deny Diamond's motion for summary judgment.

As to the second amount of $75,085, T. Rowe Price asserts that this amount represents cash distributions erroneously paid to Diamond as a limited partner of NFFII. The Court must review the relevant partnership documents in analyzing this claim.

Under the NFFII limited partnership agreement, certain cash distributions were to be allocated among the partners, which included two T. Rowe Price entities [208] and Diamond. The T. Rowe Price accounting office, per Joseph P. Croteau, Director of Financial Reporting for T. Rowe Price, erroneously allocated $75,085 to Diamond in 1991. [209] Croteau discovered the error in January 1992 during an audit of the fund, and he so informed Diamond in a memorandum dated February 6, 1992. The memorandum stated that T. Rowe Price would treat the excess distributions as advances to Diamond and that she would repay them through deductions from future distributions. [210]

Although Diamond offers no rebuttal of the Croteau memorandum, she disputes generally that she owes the $75,085. [211] She maintains that T. Rowe Price was motivated to request repayment as part of the conspiracy to harass her into resigning. [212] Diamond intends to force the firm to prove its claim in a court of law. She argues, however, that this Court lacks jurisdiction over the claim.

Section 20(d) of the NFFII partnership agreement provides that any disagreement relating to the partnership agreements shall be litigated in the courts of the Netherlands Antilles according to the laws of that

206. An acknowledgment must be "unaccompanied by any qualification or declarations, which, if true, would exempt the defendant from any moral obligation to pay." *Id.* (citations omitted). In Maryland, this principle is known as the "Potterton Principle." *Antigua Condominium Ass'n v. Melba Investors Atlantic, Inc.*, 307 Md. 700, 733–34, 517 A.2d 75 (1986).

207. That is, Diamond first tolled the statute of limitations in 1989 but tolled it again in 1990, 1991, and 1992.

208. T. Rowe Price Associates Frontiers and T. Rowe Price New Frontier Management Associates.

209. Appendix 4, Defendant's Motion for Summary Judgment on Count VI of the Amended Counterclaim.

210. Appendix 5, Defendant's Motion for Summary Judgment on Count VI of the Amended Counterclaim.

211. Diamond Deposition at 1755–56, Appendix 2, Defendant's Motion for Summary Judgment on Count VI of the Amended Counterclaim. Diamond did not register a contemporaneous objection to Croteau's memorandum. She advances no theory to support the proposition that she is entitled to the advance. Nevertheless, Diamond stated on deposition that "it[] [was] not clear to [her] that any mistake was made." Diamond Deposition at 1755, Exhibit 1, Plaintiff's Motion for Summary Judgment on Amended Counterclaim.

212. *Id.*

jurisdiction.[213] An incorrect distribution constitutes a claim relating to the partnership agreement, for the agreement contains comprehensive provisions governing distributions.[214] Indeed, Croteau wrote in his memorandum that he discovered the incorrect distributions only after a "detailed review" of the partnership agreement.[215]

T. Rowe Price asserts that it is not bound by section 20(d) because the firm was not a signatory to the NFFII partnership agreement.[216] Technically, T. Rowe Price is correct. The partnership is a separate legal entity called T. Rowe Price New Frontier Investment Associates ("NFIA").[217] The general partners of NFIA were two subsidiaries of T. Rowe Price rather than the firm itself.[218] The flaw in T. Rowe Price's argument is that it proves too much. If the firm is a "stranger" to the partnership, then it lacks standing to sue Diamond for amounts

erroneously paid to Diamond by the partnership.

Additionally, T. Rowe Price's argument is hypertechnical and dissolves upon analysis. NFIA was the creature of T. Rowe Price. The firm was the corporate "parent" of the general partners and became directly involved in the over-allocation issue.[219] Croteau, an official of T. Rowe Price, spotted the overpayments, but he did not suggest that Diamond would have to repay NFIA. Instead, his memorandum stated that excess distributions would be treated as advances to Diamond from T. Rowe Price. As such, Croteau stated, T. Rowe Price would be required to report to the Internal Revenue Service, as imputed income, the interest that Diamond would have had to pay a commercial lender for a loan of $75,085. Thus, T. Rowe Price, as an entity, elected to ignore the official form of the partnership and to handle the overpayment as a matter between itself and

**213.** Section 20(d) states:

[T]he agreement shall be construed in accordance with the laws of the Netherlands Antilles and any disagreement relating thereto shall be adjudicated in the courts of the Netherlands Antilles.

Appendix A, Defendant's Motion for Summary Judgment on Count VI of the Amended Counterclaim.

**214.** *See id.* § 10(a)–(b).

**215.** Appendix 5, Defendant's Motion for Summary Judgment on Count VI of the Amended Counterclaim.

**216.** T. Rowe Price also argues that section 20(d) of the partnership agreement is merely a nonbinding forum selection clause. The argument is groundless. Section 20(d) states that any disagreement relating to the agreement "shall be construed in accordance with the laws of the Netherlands Antilles." Thus, the governing law—as well as the appropriate forum—is that of the Netherlands Antilles. Additionally, there are strong practical reasons why this claim should be litigated in the courts of the Netherlands Antilles. Local courts will of course be more conversant with the law of that jurisdiction than this Court.

**217.** Diamond Deposition Exhibit 119 at 1, Appendix 12, Defendant's Motion for Summary Judgment on Compensation Discrimination and Managing Director Claims.

**218.** The two entities were: T. Rowe Price Associates Frontiers, Inc., a Maryland corporation, and T. Rowe Price New Frontier Management Associ-

ates (Netherlands Antilles) N.V., a Netherlands Antilles corporation.

**219.** Counsel for T. Rowe Price admitted in a recitation of the facts that the firm created NFIA and other related entities:

T. Rowe Price formed a new limited partnership to take [the place of NFFI]. The new partnership, T. Rowe Price New Frontier Fund II (Netherlands Antilles), C.V. ... commenced operations in April 1989.... Ed Mathias—a member of T. Rowe Price's Management Committee—was the Chairman of New Frontier II.... Two T. Rowe Price entities served as the general partners, and a Bermuda corporation—T. Rowe Price Frontier Limited—was the limited partner.... *As the General Partner, T. Rowe Price invested approximately $1 million in New Frontier II.*

Defendant's Motion for Summary Judgment on Constructive Discharge Claim at 3–4 (emphasis added):

Further, the NFFII private placement memorandum states the following as the first sentence of the introductory summary:

T. Rowe Price Frontier Limited (the "Company") is being organized as a Bermuda corporation by T. Rowe Price Associates, Inc. of Baltimore, Maryland ("T. Rowe Price Associates") *for the purpose of acquiring a limited partnership interest in T. Rowe Price New Frontier Fund II (Netherlands Antilles, C.V., a Netherlands Antilles limited partnership (the "Partnership")).*

Appendix 3 at 5, Defendant's Motion for Summary Judgment on Constructive Discharge Claim.

Diamond. Having done so, the firm is bound to follow the dispute resolution provisions contained in the partnership agreements.

 Further, the entity that allegedly overpaid Diamond, NFIA, is an indispensable party to any collection suit against Diamond. NFIA is, in effect, the real party in interest. Under section 20(d), any suit brought by NFIA must be litigated in the Netherlands Antilles.[220] If T. Rowe Price were admitted into the suit as an additional party, its presence would not diminish the status of the suit as one between Diamond and NFIA.[221]

In sum, the Court concludes that it lacks subject matter jurisdiction over the alleged erroneous distribution of $75,085. Accordingly, pursuant to Federal Rule of Civil Procedure 12(h)(3), the Court shall, by separate order, dismiss the part of Count VI of the amended counterclaim dealing with the $75,085 amount.

## IV. CONCLUSION

For the reasons stated herein, the Court shall:

(1) GRANT T. Rowe Price's motion for summary judgment on all counts of the second amended complaint;

(2) GRANT Diamond's motion for summary judgment on Counts I–V of the amended counterclaim;

(3) GRANT T. Rowe Price's motion for summary judgment on Count VI of the amended counterclaim as it relates to a $35,000 loan to Diamond that she has not repaid; and

(4) DISMISS, because of lack of subject matter jurisdiction, that part of Count VI of the amended counterclaim relating to $75,085 that T. Rowe Price allegedly overpaid Diamond.

220. This result would obtain even if NFIA were to assign to T. Rowe Price its claim against Diamond.

221. T. Rowe Price also argues that the $75,085 figure was a loan that Diamond agreed to repay to the firm or to NFFII. This argument contradicts the clear and unambiguous language of the Croteau memorandum, which states that the $75,085 in controversy represented partnership distributions incorrectly allocated to Diamond. There is no evidence that Diamond ever agreed

Further, plaintiff's motion for reconsideration shall be denied; all other pending motions shall be dismissed as moot.

to "borrow" the $75,085 from the firm, that Diamond ever agreed to repay T. Rowe Price, or that Diamond ever discussed any terms and conditions of repayment with the firm. Diamond Deposition at 1755–56, Appendix 2, Defendant's Motion for Summary Judgment on Count VI of the Amended Counterclaim. Thus, NFIA's alleged over allocation to Diamond was never transformed into a loan from T. Rowe Price to Diamond.